## A01A1006. BELMAR v. THE STATE.
### (555 SE2d 902)

BLACKBURN, Chief Judge.

Following a jury trial, Clifford Belmar appeals his convictions for armed robbery, aggravated battery, and aggravated assault,[1] contending that the trial court erred by allowing the jury to hear certain hearsay testimony of his co-conspirators, Tyrone Arrington, Chauncey Brantley, and Antonio Thomas. Specifically, Belmar argues that these statements (1) were not admissible under the hearsay exception for statements of co-conspirators and (2) lacked indicia of reliability, thereby making their admission a violation of the Sixth Amendment. For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict, the record shows that, around 1:00 a.m. on March 25, 1998, Joe Perdue was leaving a neighbor's apartment and returning to his own when he noticed a white Cutlass parked nearby. As Perdue passed the vehicle, he was able to observe its occupants because an overhead light was illuminating the interior. Moments later, one of the men sitting on the passenger's side of the car followed Perdue to the landing outside his apartment, held a gun to Perdue's head, attempted to break into Perdue's apartment, and robbed Perdue. Then, a second man, also sitting on the passenger's side of the car, came up to the landing and told the first man that he was taking too long and that he should just shoot Perdue. Thereafter, both assailants shot Perdue in the legs and fled with the other men waiting in the parked car. Perdue later iden-

---

[1] Following his conviction, Belmar also pled guilty to possession of a firearm by a convicted felon.

tified Belmar as one of the men who shot him from a photographic lineup. Perdue again identified Belmar as one of his assailants during trial.

Several witnesses testified regarding the scheme devised between Belmar, Arrington, Brantley, and Thomas to rob and assault Perdue. Having subsequently pled guilty to the crimes involved, Thomas testified that, on the day of the shooting, he was picked up by Belmar, Arrington, and Brantley. At that time, Belmar, Arrington, and Brantley discussed their plans to rob Perdue and run him out of the apartment complex in order to have a monopoly on marijuana sales there. Thomas further testified that, later that night, Arrington drove to the apartment complex where Perdue lived, and Belmar and Brantley shot Perdue.

Eric Heard, a friend of Belmar and Arrington, testified that, sometime prior to the date of the crime, Belmar, Arrington, Brantley, and Thomas told him about their plans to rob Perdue. At that time, Heard, a resident of Perdue's apartment complex, tried to talk the others out of going through with their plan. Also prior to the date of the crime, Heard was arrested and jailed for a probation violation, and after the crime against Perdue was committed, Arrington visited Heard at the jail. During this visit, Arrington described the robbery and shooting to Heard and informed him that Belmar, Brantley, and Thomas were involved.[2]

Dorian Nassau, an acquaintance of Heard, testified that, when he visited the jail, Heard related to him that he had been told about Perdue's robbery by Belmar, Arrington, Brantley, and Thomas prior to its occurrence. Heard also told Nassau that Arrington had visited him and told him that the robbery had been accomplished. A couple of days later, Heard called Nassau and, once again, described the robbery to him. Nassau subsequently relayed this information to the police.

In addition, after his arrest, Brantley made a recorded statement to police that he was present when Belmar, Arrington, and Thomas were planning the robbery of Perdue. This recorded statement was played for the jury at trial.[3]

This evidence, including Perdue's direct identification of Belmar as one of the men who shot him, was certainly sufficient to support his conviction. See *Jackson v. Virginia*.[4]

1. Belmar, nonetheless, contends that, because the State could not prove the existence of a conspiracy without relying on testimony

---

[2] Heard recanted this testimony at trial and testified that he had fabricated his earlier statements to get favorable treatment from the State in his probation revocation hearing.

[3] Like Heard, Brantley recanted his earlier statements to police at trial.

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

from his co-conspirators, the trial court erred by admitting this hearsay testimony pursuant to OCGA § 24-3-5.

OCGA § 24-3-5 provides: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."

> Under OCGA § 24-3-5, the State must make a prima facie showing of the existence of the conspiracy, without regard to the declarations of the co-conspirator[s], in order to admit [their] out-of-court declarations. The trial judge may admit testimony by co-conspirators before the conspiracy has been proved, provided its existence is ultimately shown at trial. Conduct which discloses a common design, even without proof of an express agreement between the parties, may establish a conspiracy.

(Citations and punctuation omitted.) *Livingston v. State.*[5]

Here, the State provided testimony from Heard that he had been privy to the discussions of the co-conspirators about the robbery sometime in advance of its execution. Heard was present at trial, took the witness stand, was subject to cross-examination, and was not a co-conspirator. Heard's testimony regarding the planning of the robbery, in and of itself, provided evidence of the conspiracy from someone other than a co-conspirator.

"[Moreover], the State need not prove an express agreement between the parties in order to establish a conspiracy. The essence of conspiracy is a common design, and conduct which discloses a common design may give rise to an inference of conspiracy. Whether a conspiracy exists is a question for the jury to determine." (Citations and punctuation omitted.) *Freeman v. State.*[6] The evidence that Belmar, Arrington, Brantley, and Thomas drove to Perdue's apartment, blew their horn for him to come outside, waited for him to approach, and followed him to his apartment, as well as the statement from the second shooter that the robbery was taking too long, provides some foundation on which the jury could determine that the robbery had been planned out and that a conspiracy existed.

Finally, we point out that, of Belmar's co-conspirators, Arrington was the only one who did not testify at trial, and Brantley and Thomas took the witness stand and were subject to cross-examination.

2. Belmar also contends that the statements of his co-conspirators violated his rights under the Sixth Amendment because

---

[5] *Livingston v. State*, 271 Ga. 714, 719 (3) (524 SE2d 222) (1999).
[6] *Freeman v. State*, 273 Ga. 137, 139 (2) (a) (539 SE2d 127) (2000).

the State failed to show that these statements had sufficient indicia of reliability. We disagree.

> [T]he statements were sufficiently reliable to warrant their admission, when assessed by circumstances recognized as indicia of reliability: the absence of an express assertion about a past fact; the declarant had personal knowledge of the identities and roles of the participants in the criminal undertaking so that cross-examination of the declarant would not have shown that the declarant was unlikely to know whether the defendant was involved; the possibility that the declarant's statement was founded on faulty recollection was remote; and the circumstances under which the declarant gave the statement suggest that the declarant did not misrepresent the defendant's involvement in the crime.

*Ottis v. State.*[7] Of these indicia, only the first weighs against reliability because the declarants' statements about the robbery concern past facts, "rather than circumstances from which the jury is invited to make its own inferences." Id. On the other hand, it is unlikely that the declarants would easily forget the details of the robbery and shooting, and the declarants' statements do not suggest that they were unfairly trying to implicate Belmar.

> In addition, we note that two of the declarants, [Brantley and Thomas], testified at trial and were available for cross-examination by [Belmar]. Thus, the purpose behind the hearsay rule was satisfied with regard to their declarations. *Abrams v. State;*[8] see *Faircloth v. State*[9] (modern trend is to allow out-of-court declaration where declarant is present and may be cross-examined).

*Quintanilla v. State.*[10]

The trial court did not err in admitting the statements of Belmar's co-conspirators in this case.

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 2, 2001.

*Sara M. Yeager*, for appellant.

---

[7] *Ottis v. State*, 269 Ga. 151, 155 (3) (496 SE2d 264) (1998).
[8] *Abrams v. State*, 229 Ga. App. 152, 153 (1) (493 SE2d 561) (1997).
[9] *Faircloth v. State*, 253 Ga. 67, 69 (316 SE2d 457) (1984).
[10] *Quintanilla v. State*, 273 Ga. 20, 23 (3) (a) (537 SE2d 352) (2000).

*J. Tom Morgan, District Attorney, Barbara B. Conroy, Sheila A. Connors, Jeanne M. Canavan, Assistant District Attorneys*, for appellee.