### A05A0462. WOMACK v. THE STATE.
(614 SE2d 909)

ELLINGTON, Judge.
A Muscogee County jury convicted Xavier Womack of armed robbery, OCGA § 16-8-41, based upon his participation in the robbery of a Brinks armored truck during which Womack's accomplice shot and killed a Brinks guard.[1] Womack appeals from the denial of his motion for new trial. Finding no error, we affirm.

1. Womack contends the evidence was insufficient to support his conviction for armed robbery. On appeal, this Court views the evidence in the light most favorable to the State, and the defendant no longer enjoys the presumption of innocence. *Jackson v. Virginia,* 443

---

[9] OCGA § 16-5-60 (b).
[1] The jury acquitted Womack of several other counts related to the crime, including murder.

U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). This Court does not weigh the evidence or judge the credibility of witnesses, but determines only if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime for which he was charged. Id.

So viewed, the record shows the following evidence. On December 20, 1995, Womack, his cousin, Jakeith Robinson, and a friend, Leon Tollette, were seen together in the lobby of a Barnett Bank in Columbus, Georgia, as the bank was closing for the day. The next morning, Robinson's blue Mustang was parked near a Brinks parking lot in Columbus; there were three men inside the Mustang. A Brinks armored truck was parked in the Brinks parking lot, warming up its engine. At approximately 9:00 a.m., both the Brinks truck and the Mustang left the area. Shortly thereafter, the Brinks guard driving the truck parked near Barnett Bank, where Womack and the other two men had been the night before. A Brinks guard walked across the street to SunTrust Bank, while another guard stayed inside the truck. Tollette was standing in front of Barnett Bank, holding a newspaper, and Womack watched the Brinks truck from across the street. The Brinks guard came out of SunTrust Bank, walked back to the truck, and opened the truck's door. Tollette suddenly ran up to the truck and shot the guard four times in the head at close range with a .357 revolver, killing him. A Wells Fargo guard who was parked nearby saw Tollette murder the guard.

According to the Wells Fargo guard, there was immediately a "spray of bullets coming from all kind of directions." Witnesses saw Womack across the street from the Brinks truck, shooting toward the truck and, moments later, running away from the scene. The second Brinks guard, who was sitting in his truck's cab, testified that he could not get out of the truck because someone was shooting at the truck from across the street. The Brinks guard and the Wells Fargo guard started shooting at Tollette, who was running away with a bag of money and shooting back at the guards. The Wells Fargo guard chased Tollette as he ran toward Robinson's Mustang, which was waiting with its door open. Tollette dropped the money, but before he could get into the Mustang, Robinson got "scared" and drove away with Womack. Tollette yelled and waved at the car trying to get it to stop. Robinson drove through two red lights before disappearing in the direction of the bridge to Phenix City, Alabama. In the meantime, the Wells Fargo guard and several police officers apprehended Tollette.

Crime scene investigators found numerous shell casings and spent bullets in the area, including several Winchester Western nine millimeter shell casings in the parking lot across from the Brinks truck. Neither of the Brinks nor Wells Fargo guards had used a nine

millimeter handgun, and Tollette used a .357 revolver during the crime. Investigators also recovered a few bullets from the area around the Brinks truck that were fired from a gun other than the guns used by Tollette or the guards.

After Robinson and Womack left the crime scene, they went to Robinson's girlfriend's apartment in Phenix City, Alabama, which is just over the 14th Street Bridge from Columbus, Georgia. Robinson's girlfriend testified that when Robinson and Womack arrived, they were out of breath, "shaken and nervous." Robinson sat down, put his head in his hands, and told his girlfriend that, "we just tried to rob a Brinks truck and someone was shot and Apple got caught." Tollette's nickname was "Apple." A few moments later, someone knocked on the door of the apartment and Robinson ran toward the door; Womack jumped up and pulled out a gun. Robinson and Womack left the apartment a short time later without telling Robinson's girlfriend where they were going.

In the meantime, investigators interviewed Tollette following his arrest. The day after the armed robbery, investigators executed a search warrant for the house where Tollette and Womack were living. Womack was in the house at the time of the search. Investigators found a box of nine millimeter cartridges missing several rounds of ammunition. According to a firearms expert who testified at trial, the cartridges were "consistent" with four spent bullets that were found at the crime scene. A second expert testified that the lead composition of five spent bullets from the crime scene matched cartridges in the box found at Womack's house. Investigators also found a large quantity of marijuana packaged for sale inside the house. Investigators collected fiber samples from Womack's house, which were later determined to match fibers found in Robinson's Mustang and fibers from the clothes Tollette was wearing at the time of his arrest.

Robinson was arrested a few days later at a relative's home in Alabama, where he had arrived unannounced in the middle of the night. During Robinson's visit, the relative heard him talking on the phone and mentioning the name "Xavier." Further, the relative heard Robinson tell his girlfriend to "shut her mouth" or he was "going to f___ her up."

The evidence also showed that, while in jail prior to trial, Robinson confided in his cellmate as follows: he helped plan the robbery but "it didn't go right"; he owned a Mustang and was the driver during the robbery, but stayed in the car; no one would be able to identify him because his car had tinted windows; he got scared when he heard shooting and drove away from the crime scene; and his girlfriend was going to give him an alibi. The inmate also overheard Robinson tell his girlfriend on the phone, "don't go sour on me now, don't do me like this now." Later, Robinson complained to the inmate

that his girlfriend "don't want to do right" and that she is "going sour on me." In addition, the inmate heard Robinson tell Tollette several times to "be strong." Finally, the inmate saw Womack at the jail, and Robinson asked the inmate to give Womack the following message: "Be strong." According to the inmate, Womack claimed, "[T]hey ain't got me, they can't identify me. They ain't got nothing."

We find that this evidence was sufficient for the jury to find Womack guilty beyond a reasonable doubt as a party to the crime of armed robbery. OCGA § 16-2-20 (party to a crime); *Maddox v. State*, 278 Ga. 823, 824-825 (1) (607 SE2d 587) (2005).

2. Womack contends the trial court improperly admitted Robinson's girlfriend's testimony regarding Robinson's statement to her immediately after the men arrived at her apartment. We disagree.

(a) Womack argues the statement should have been excluded because the State failed to show that there was an ongoing conspiracy between Robinson and Womack when Robinson made the statement. Under an exception to the hearsay rule, the statement of any co-conspirator during the pendency of a criminal project is admissible against every other co-conspirator. OCGA § 24-3-5. "To render an out-of-court statement admissible under OCGA § 24-3-5, the prosecution need only show that it was made by a co-conspirator during an ongoing conspiracy with the defendant and that it bears sufficient indicia of reliability." (Citation omitted.) *Arevalo v. State*, 275 Ga. 392, 397 (5) (567 SE2d 303) (2002). "The trial judge may admit testimony by co-conspirators before the conspiracy has been proved, provided its existence is ultimately shown at trial." (Citation and footnote omitted.) *Belmar v. State*, 252 Ga. App. 264, 266 (1) (555 SE2d 902) (2001). "The question of the existence of a conspiracy is ultimately for the jury to determine. The existence of a common design or purpose between two or more persons to commit an unlawful act may be shown by direct or circumstantial evidence." (Citations and punctuation omitted.) *Mayne v. State*, 258 Ga. 36, 37 (2) (365 SE2d 270) (1988). Further, the Supreme Court of Georgia has held that

> the criminal project is still pending so long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues. . . . [S]o long as the conspiracy to conceal the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other.

(Citations, punctuation and emphasis omitted.) *Arevalo v. State*, 275

Ga. at 396-397 (5) (holding that a conspiracy between two brothers "never ended," because they attempted to conceal their roles in a murder by continuing to insist that a third party was the sole shooter). See also *Jones v. State*, 265 Ga. 84, 85 (2) (453 SE2d 716) (1995) ("Although a conspirator's statement, which is made to police and incriminates a co-conspirator, brings the conspiracy to an end, a like statement which is made to acquaintances does not.") (citations omitted).

In this case, the evidence showed that Robinson and Womack arrived at the girlfriend's apartment shortly after the armed robbery, while the police investigation was still ongoing. Robinson spontaneously made the statement at issue within moments after he and Womack arrived at the apartment, while they were still visibly shaken, nervous, and out of breath. Robinson subsequently fled to a relative's house, where he stayed until his arrest days later. Robinson and Womack both repeatedly denied any involvement in the armed robbery and, while in jail, urged each other to "be strong." Robinson also called his girlfriend from jail and threatened her to "shut her mouth." We find the evidence was sufficient to demonstrate the existence of an ongoing conspiracy between Robinson and Womack at the time of Robinson's statement to his girlfriend.[2] *Shelton v. State*, 279 Ga. 161 (2) (611 SE2d 11) (2005); *Livingston v. State*, 271 Ga. 714, 719 (3) (524 SE2d 222) (1999); *Jones v. State*, 265 Ga. at 85 (2).

(b) Further, to the extent Womack argues that there is insufficient evidence identifying him as the third person involved in the conspiracy with Robinson and Tollette, this issue has been resolved adversely to Womack in Division 1, supra.

(c) Womack also contends admission of the statement violated his constitutional right to confront witnesses against him, relying on *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004). In *Crawford*, the United States Supreme Court prohibited the use of an unavailable co-conspirator's testimonial statement, holding that the statement could not be admitted unless the defendant had an opportunity to confront his alleged co-conspirator. Id. at 67-69 (V) (C). Although the Supreme Court declined to give a comprehensive definition of the term "testimonial" in *Crawford*, the Court specifically noted that the term referred to statements made during police interrogations and during grand jury or court appearances. Id. at 68 (V) (C); see also id. at 51-52 (III) (A) (observing that "[a]n accuser who

---

[2] Based upon our finding that the conspiracy was still in progress at the time of Robinson's statement, we reject Womack's argument that the admission of the statement violated OCGA § 24-3-52. That statute provides that, if a co-conspirator confesses to a crime *after the conspiracy has ended*, the State may use the confession against the declarant, but not against anyone else involved in the conspiracy.

makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). In contrast to such formal statements, Robinson's admission in this case clearly was not "testimonial" in nature. Robinson spontaneously told his girlfriend that he had been involved in an armed robbery; he was not responding to police interrogation or testifying during a court proceeding. Accordingly, Womack's reliance on *Crawford* is misplaced. See *Watson v. State*, 278 Ga. 763, 765 n. 2 (604 SE2d 804) (2004) (finding that an unavailable witness' statements to close friends were not testimonial in nature, so the statements were not subject to a *Crawford* analysis).

3. Womack contends the trial court violated his right to be present during all stages of his trial.

> The accused and his counsel have the right to be present at every stage of the proceedings and personally see and know what is being done in the case. . . . The right may be waived by the defendant personally, or by defendant's counsel if counsel does so in the defendant's presence or pursuant to the defendant's express authority, or the defendant may subsequently acquiesce in counsel's waiver.

(Citations and punctuation omitted.) *Goodroe v. State*, 224 Ga. App. 378, 380 (1) (480 SE2d 378) (1997).

(a) During a pre-trial conference in the court's chambers with the prosecutor and trial counsel for Robinson and Womack, the court discussed the State's offer of immunity to Tollette in exchange for his testimony against Robinson and Womack.[3] Womack's counsel expressly waived Womack's presence at the conference, and Womack never complained at trial about having been absent during the conference. Further, the transcript shows that Tollette never testified at trial.

The Supreme Court of Georgia has previously found there was no error when the trial court conducted similar proceedings in the defendant's absence, since the defendant had no legal basis upon which to object to the State's request for an order to compel the witness to testify. See *King v. State*, 273 Ga. 258, 264-265 (15) (539 SE2d 783) (2000) ("While King might have preferred that a key witness not be ordered to testify truthfully in his trial, there is nothing in Georgia law that would have permitted him to object to the

---

[3] Tollette had already pled guilty to felony murder for his part in the armed robbery. A jury trial on sentencing resulted in a death sentence.

State's request for the order" to compel his testimony.) (citation omitted). Accordingly, this alleged error provides no basis for reversing his conviction.

(b) During the same conference in chambers, Womack's counsel presented the court with a motion in limine to exclude the statement of Robinson's girlfriend. See Division 2, supra. After hearing argument from the defense and prosecution regarding the admissibility of the statement, the trial court reserved ruling on the issue. Later, the court twice heard arguments on the issue in the courtroom, once during a break in jury selection and again during a bench conference just before the girlfriend testified. There is nothing in the record to suggest that Womack was not present in the courtroom during these arguments or that he ever indicated any objection to being absent from the earlier conference in chambers. Further, he did not raise this issue in his motion for new trial or at the hearing thereon. Pretermitting whether the brief hearing in chambers was a critical stage of the trial at which Womack had a right to be present, we find the evidence was sufficient to show that Womack was aware of the substance of the hearing during trial and that he acquiesced in the decision to conduct the hearing in his absence by failing to repudiate it at the first opportunity. *Parker v. State*, 220 Ga. App. 303, 312 (12) (469 SE2d 410) (1996); see also *Kennedy v. State*, 274 Ga. 396, 397 (3) (554 SE2d 178) (2001) ("a defendant waives appellate review of an allegedly improper . . . communication [during a bench conference] when, prior to verdict, defendant is aware of the communication and fails to voice an objection") (punctuation and footnote omitted).

(c) Womack also argues that he was denied the right to be present when the court excused a juror for cause. The record shows that the court notified the prosecutor and both defense counsel that one of the jurors needed to go home. Before discussing the issue, both defense counsel waived their clients' presence. The juror then told the court that her water service to her home had been disconnected and that she needed to get service restored immediately so she would be able to take her prescription medications for a serious medical condition. Womack's counsel told the court, on behalf of Womack, that he did not oppose allowing the juror to be excused for cause. Before excusing the juror, the court instructed both counsel to confer with their clients to ensure that the clients agreed with the decision, and both counsel did so. After the jury returned to the courtroom, the court announced that the juror had an emergency at home and had been excused. Even though he knew the juror had been excused, Womack never expressed any objection to the court's decision or the fact that the court had discussed the issue with counsel in his absence. We find that Womack acquiesced in his counsel's waiver of his presence. *Kennedy v. State*, 274 Ga. at 397 (3); *Parker v. State*, 220 Ga. App. at 312 (12); see also

*Kirkland v. State*, 247 Ga. App. 526, 528-529 (3) (a) (543 SE2d 791) (2001) (because the trial court has the discretion under OCGA § 15-12-172 to remove a juror if it independently determines the juror is too ill or otherwise unable to perform his or her duties, the court does not violate the defendant's rights by failing to hold a hearing in his presence prior to excusing the juror), rev'd on other grounds, 274 Ga. 778 (560 SE2d 6) (2002).

4. Womack contends his trial counsel provided ineffective assistance by failing to object when the State's witnesses testified as experts without being qualified as experts. Womack also argues that trial counsel was ineffective for failing to object to portions of the State's closing arguments. Womack has waived these arguments, however, by failing to raise them in his motion for new trial as amended. The record shows that Womack's trial counsel filed a motion for new trial raising the general grounds. The trial court appointed an attorney to represent Womack in his appeal in January 2000, and the attorney filed two amendments to the motion for new trial. Both of the motions asserted claims of ineffective assistance, but neither raised the issues argued on appeal. The attorney also represented Womack at the motion for new trial hearing and argued the issue of ineffective assistance, but did not argue the two grounds asserted on appeal. "Where the issue of trial counsel's effectiveness has been raised on motion for new trial, any claims [of ineffective assistance by trial counsel] not raised at that time are waived."[4] (Citations omitted.) *Wilson v. State*, 277 Ga. 195, 200 (2) (586 SE2d 669) (2003). See also *Ricarte v. State*, 249 Ga. App. 50, 54 (4) (547 SE2d 703) (2001) (refusing to consider on appeal claims of ineffective assistance by trial counsel that differed from those argued in the trial court). Accordingly, Womack has waived these alleged errors.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED MAY 18, 2005 — 

*Zell & Zell, Rodney S. Zell*, for appellant.

---

[4] Although Womack cites to *Rucker v. State*, 268 Ga. 406 (489 SE2d 844) (1997), in an attempt to preserve his ineffectiveness claims against trial counsel by arguing his first appellate counsel was *also* ineffective for failing to raise the claims in his motion for new trial, his reliance on *Rucker* is misplaced. The Court in *Rucker* found that ineffectiveness claims against a prior appellate counsel based upon his failure to secure a witness for the motion for new trial hearing were timely raised on appeal. Id. at 408 (3). But the Court also held that ineffectiveness claims against trial counsel which were raised on appeal but which differed from those raised in the motion for new trial were procedurally barred. Id. at 408 (2). Accordingly, *Rucker* provides no basis upon which to preserve Womack's ineffectiveness claims against his trial counsel.

*J. Gray Conger, District Attorney, David R. Helmick, Assistant District Attorney*, for appellee.