[803 NYS2d 66]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AHIB
PAUL, Also Known as PAUL AHIB, Appellant.

First Department, October 27, 2005

APPEARANCES OF COUNSEL

*Robert S. Dean, Center For Appellate Litigation*, New York City (*Jody Ratner* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Allen H. Saperstein* and *Peter D. Coddington* of counsel), for respondent.

**OPINION OF THE COURT**

SAXE, J.P.

In *Crawford v Washington* (541 US 36 [2004]), the United States Supreme Court ruled that the admission of "testimonial" statements by an unavailable witness violates the Confrontation Clause of the United States Constitution unless the defendant had the opportunity to cross-examine the person who made the statement. Since then, disagreements have arisen about which types of out-of-court statements do and do not violate the Confrontation Clause. In this appeal of a murder conviction, defendant argues that the testimony of civilian eyewitnesses as to a dying declaration made by the victim, naming defendant as his assailant, should have been excluded as violative of the rule enunciated in *Crawford*.

Facts

On July 1, 2001, Derrick "Ginger" Thompson was shot and killed in the area of East 169th Street in the Bronx. Several residents of that street testified to what they observed of the incident.

One of the witnesses stated that she was familiar with defendant, whom she knew as "Jermaine," from previous interactions with him during the year prior to the incident, but did not like him and generally avoided him. She described an incident a few evenings before the shooting, when defendant and a man named Mark approached her to sell marijuana to her, telling her that they were working for Ginger, her usual supplier. At the time, defendant wore his hair in long, wild dreadlocks tied in a ponytail. This witness stated that she bought marijuana from defendant on that day, but found that it had no potency. Some 45 minutes later, when she saw Ginger and complained, he said that nobody sold for him. The two found defendant and Mark, and a brief verbal confrontation ensued.

On the evening of the shooting, this witness bought marijuana from Ginger and then went upstairs to her apartment, where

she sat down at a window that gave her a clear, unobstructed, well-lit view of Ginger. Soon, she saw defendant, wearing a white tee shirt wrapped on his head as a headdress, approaching Ginger. Ginger gestured that he should wait, and defendant sat down on a nearby wall. Ginger came over in a minute and sat down next to defendant, and they talked. Ginger handed something to the defendant. A confrontation then began. She observed as defendant and Ginger began pushing each other. It seemed playful at first, but then defendant took Ginger in a headlock and slammed him on the hood of a car. They stood up. Defendant started to walk away. Ginger hurled a bottle at him. Defendant then turned, came back, drew a gun from his waist, and fired a shot, which missed. He fired again and hit Ginger, knocking him on his back. Defendant bent over Ginger and went through his pockets. He then joined Mark nearby, and the two casually walked away. The witness called 911, and then went down to Ginger. Although she initially did not tell the investigating officers that she heard Ginger say anything, she testified that in fact she heard Ginger say he was dying, and repeatedly say that "Jermaine" or "Dreds" had shot him.

A second witness, who lived across the street from the location from which Ginger usually sold marijuana, had something of a personal relationship with him. Ginger would buy treats for her grandchildren, and he had nicknamed her "Ma." At the time of the shooting she was in her kitchen, and heard a shot. From her window, she saw Ginger lying on the sidewalk waving his hand for help, and she ran down to him.

Both women were permitted to testify that after the shooting, while they were sitting with Ginger, they heard Ginger repeatedly say that he was dying, and that "Jermaine" or "Dreds" had shot him.

Defendant's primary contention on appeal is that the admission of this hearsay testimony violated his right to confrontation under the Sixth Amendment.

Dying Declarations

Initially, before the dictates of the Confrontation Clause and *Crawford* are even addressed, it must be ascertained if the statement is even admissible under a hearsay exception. The hearsay exception for dying declarations, which predates the founding of this republic (*see Mattox v United States*, 156 US 237, 243-244 [1895]), is, in this state, now founded upon the theory that "awareness of impending death . . . is presumed to remove from the mind all motivation and inclination to lie" (*People v*

*Nieves*, 67 NY2d 125, 132 [1986]). However, because we recognize that dying declarations are "made with no fear of prosecution for perjury and without the test of cross-examination" (*id.* at 133), we must examine the statement carefully to be certain that the declarant correctly understood death to have been imminent at the time he made the statement (*see id.* at 132-133).

In *Nieves*, the declarant's statement inculpating the defendant did *not* fall within the hearsay exception because the nature of her condition when she spoke did not, subjectively or objectively, justify an expectation of death. In the case before us, however, the declarant knew that he had been shot in the neck from about one foot away, and from an objective standpoint, had suffered a mortal gunshot wound which perforated his spine, lung and major blood vessels (*see People v Falletto*, 202 NY 494 [1911]; *People v Liccione*, 63 AD2d 305 [1978], *affd* 50 NY2d 850 [1980]), making the hearsay exception applicable.

The Application of *Crawford v Washington*

Under the Supreme Court's recent pronouncement in *Crawford*, a statement may fall within an accepted hearsay exception and nevertheless not satisfy the Constitution's Confrontation Clause. Defendant contends that the witnesses' testimony regarding Derrick Thompson's alleged statement inculpating him as the perpetrator of the shooting is such a statement.

Initially, we note that defendant's Confrontation Clause argument is unpreserved, and we decline to review it in the interest of justice. Were we to review it, for the reasons that follow we would find no basis for reversal.

Much remains to be decided in the wake of *Crawford*. For one thing, the Court "le[ft] for another day any effort to spell out a comprehensive definition" of the term "testimonial statement" (541 US at 68). Although the term would apply "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" (*id.*), the category that still remains open involves various types of out-of-court statements made in less formal contexts.

At least two distinct schools of thought exist, based upon the divergent views contained in two scholarly discussions which were both cited in *Crawford*: that of Professor Richard Friedman (*see* Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo LJ 1011 [1998]) and that of Professor Akhil Reed Amar (*see* Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman*, 86 Geo LJ 1045 [1998]). The basic view

of Professor Friedman is that a hearsay statement is testimonial if the declarant makes a statement with the expectation that it will be used in the prosecution or investigation of the crime; his definition would include a statement made by a crime victim describing a crime, whether made to authorities or not (*see* Shechtman, Outside Counsel, *'Crawford' and the Meaning of Testimonial*, NYLJ, June 23, 2004, at 4, col 4). In contrast, Professor Amar would limit "testimonial" to statements "prepared by the government for in court use" and would exclude all "private accusations made out of court by one private person to another" (*see id.* at cols 4, 5)

In applying *Crawford*, courts of this state have tended toward Professor Amar's approach, defining "testimonial" by the presence of the formalities that surround statements prepared for in-court use. Thus, in *People v Bradley* (22 AD3d 33, 35 [2005]), this Court found no Confrontation Clause violation when, in response to a police officer who arrived at the scene and asked "[W]hat happened?" the victim told the officer that her boyfriend threw her through a glass door. The Court in *Bradley* relied upon the conclusion in *People v Newland* (6 AD3d 330, 331 [2004], *lv denied* 3 NY3d 679 [2004]) that " 'a brief, informal remark to an officer conducting a field investigation' does not implicate the civil-law abuses sought to be avoided by preserving the accused's right to confront a witness" (*see People v Bradley*, 22 AD3d at 38).

Similarly, in *People v Diaz* (21 AD3d 58, 62 [2005]), this Court considered the statement, "That's them," made by the victim as he lay in an ambulance a half hour after the crime, when two men were brought up to him by police officers. It held the statement was properly categorized as an excited utterance, but that the critical question for purposes of the Confrontation Clause was not whether the statement falls within a hearsay exception, but how it was elicited: "[t]here are circumstances in which an excited utterance would arguably be testimonial, particularly where it was given in reply to the deliberate questions of a police officer" (*id.* at 66 [citation and internal quotation marks omitted]). It concluded that admission of the statement at issue there was not violative of the Confrontation Clause because it was a visceral response and was volunteered, rather than the result of structured police questioning (*id.* at 67; *see also People v Royster*, 18 AD3d 375, 376 [2005], *lv denied* 5 NY3d 794 [2005]; *People v Coleman*, 16 AD3d 254, 255 [2005]).

Applying the same approach to the out-of-court statements at issue here, they do not fall within the foregoing established def-

inition of "testimonial," since they were not elicited through structured questioning by an investigator. While, parenthetically, it seems unlikely that a series of responses to an orderly series of structured questions by an investigator will often take place while the declarant's death is imminent, in any event the statements at issue here were neither elicited in a formal manner nor elicited by an investigator. Indeed, they were simply volunteered, to people who were friends, acquaintances or neighbors. Pursuant to the definition of testimonial already adopted by this Court, these statements do not fall into that category, and are therefore not precluded, under the *Crawford* analysis, by the Sixth Amendment.

Notably, however, even if we were to adopt the broader definition of "testimonial" propounded by Professor Friedman, his approach would nevertheless carve out an exception to the application of the Confrontation Clause here.

> "If a statement is made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime, then the statement should be deemed testimonial. . . .
>
> "If a statement is testimonial, then the declarant is a witness for purposes of the Confrontation Clause, and the statement must not be offered against the accused unless . . . the witness . . . made or confirmed the statement under oath and . . . the accused . . . had an adequate opportunity to cross-examine her. This is a categorical rule, subject to but one qualification: *If the inability of the witness to testify under these procedures is attributable to wrongdoing by the accused, then the accused may be deemed to have forfeited the confrontation right"* (Friedman and McCormack, *Dial-In Testimony*, 150 U Pa L Rev 1171, 1240-1241 [2002] [emphasis added]).

Accordingly, even the broader definition of "testimonial" propounded by Professor Friedman would *not* find the Confrontation Clause to be violated by admission of the hearsay at issue here, in which witnesses repeated Derrick Thompson's statements identifying defendant as the person who shot him (*but see People v Maher*, 89 NY2d 456, 462 [1997] [rejecting use of hearsay exception for statement by homicide victim based upon defendant having caused victim's unavailability]).

In view of the foregoing, we leave to another day the question of whether testimonial dying declarations are subject to an absolute exception to the application of the Confrontation Clause, a possibility suggested in *Crawford* (541 US at 56 n 6).

Finally, as the People concede, the indeterminate term for the third-degree weapon conviction was unlawful, and we therefore replace it with a determinate sentence. As the People also concede, since the crime was committed prior to the effective date of the legislation providing for the imposition of a DNA databank fee (Penal Law § 60.35 [1] [a] [v] [former (1) (e)]), that fee should not have been imposed. We perceive no basis for reducing the sentence.

Accordingly, the judgment of the Supreme Court, Bronx County (Troy K. Webber, J.), rendered September 23, 2003, convicting defendant, after a jury trial, of murder in the second degree (two counts), manslaughter in the first degree, attempted robbery in the first degree and criminal possession of a weapon in the second and third degrees, and sentencing him, as a second felony offender, to an aggregate term of 20 years to life, should be modified, on the law, to the extent of vacating the sentence of 3½ to 7 years for the third-degree weapon conviction and substituting a term of 3½ years for that conviction to run concurrently with the sentences for the remaining convictions, and vacating the DNA databank fee, and otherwise affirmed.

MARLOW, WILLIAMS, SWEENY and CATTERSON, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered September 23, 2003, modified, on the law, to the extent of vacating the sentence for the third-degree weapon conviction and substituting a new sentence, and vacating the DNA databank fee, and otherwise affirmed.