## STATE OF CONNECTICUT *v.* JASON MILLER
## (AC 26286)

Flynn, Bishop and McLachlan, Js.*

---

* The listing of judges reflects their status on this court as of the date of oral argument.

Argued January 10—officially released May 16, 2006

*John W. Watson*, special public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Richard Colangelo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Jason Miller, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-55a (a), 53a-55 (a) (1) and 53a-8.[1] The defendant claims that the trial court (1) improperly denied his motion for a judgment of acquittal because there was insufficient evidence to support his conviction, (2) violated his right of confrontation by admitting certain hearsay evidence

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-8 provides: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.

"(b) A person who sells, delivers or provides any firearm, as defined in subdivision (19) of section 53a-3, to another person to engage in conduct which constitutes an offense knowing or under circumstances in which he should know that such other person intends to use such firearm in such conduct shall be criminally liable for such conduct and shall be prosecuted and punished as if he were the principal offender."

and (3) violated his right to present a defense by excluding certain evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the afternoon of November 22, 2001, David Rowley and Miriam Montanez witnessed an altercation between Curtis Easton and Aki Johnson, a cousin of the defendant. As the argument escalated, Johnson struck Easton in the head, knocking him to the ground. Easton responded by shooting Johnson. Rowley thereafter exited his vehicle, called an ambulance and attended to Johnson, who ultimately survived. Also present at the shooting was Anthony Patterson.

On the evening of November 26, 2001, Rowley and Montanez were exiting a parking lot when two other vehicles blocked their vehicle. Although it was dark, Montanez recognized Patterson, Craig Holloway and "one of the [Preston] twins."[2] Preston exited one of the vehicles and approached, but upon seeing Montanez in the vehicle, he immediately turned around and returned to his vehicle. Montanez testified that Rowley told her that "[t]hey're trying to f___ him over with that thing with [Johnson]," which she took to mean that "they" believed Rowley "had something to do with Johnson getting shot." Montanez never testified as to whom "they" referred. Montanez also stated that, following the Johnson shooting, Rowley's face expressed worry.

Rowley and Montanez spent the next day together, returning at approximately 6 p.m. to her residence at apartment 3B in building sixteen of the Roodner Court housing complex (Roodner Court), located at 261 Ely Avenue in Norwalk. As the two exited Rowley's vehicle and headed for the apartment, the defendant approached. Montanez entered her apartment while

[2] Montanez testified that Kevin Preston and Keith Preston are twins whom she cannot distinguish.

Rowley and the defendant spoke. Their conversation lasted almost an hour. After it ended, Rowley entered the apartment and fell asleep on a couch. At 9:30 p.m., the defendant met with Patterson and Preston outside building seventeen of Roodner Court. At 10 p.m., Montanez' sister, Diana Ramos, answered a knock on the apartment door by the defendant. The defendant asked if Rowley was there and entered the apartment. He proceeded to the couch where Rowley was sleeping and punched Rowley in the chest, waking him. The defendant then told Rowley that "the cops are f___ing with your car. You've got to move your car." The defendant then left the apartment.

Minutes later, Rowley left the apartment to move his vehicle. Within seconds, gunfire reverberated throughout the complex. Montanez ran out of the apartment and down the stairs, where she found Rowley leaning against the back door of the building, which was propped open by a piece of wood. He was shot in the chest and could not speak. The police were called, and paramedics performed cardiopulmonary resuscitation on Rowley. At that time, the defendant reentered the building and asked, with a smirk on his face, "Who got shot?" Rowley was transported to Norwalk Hospital, where he was pronounced dead.

Jeanine Addison, a resident of Roodner Court at the time of the shooting, testified that, while standing outside building sixteen, she heard gunshots inside the building. She then saw the defendant exit the building. She explained that, as she ran into the building, the defendant "was walking normal like nothing happened. His head was down. His hands were down. He didn't look at me."

Upon arriving at the scene, Officer Kenneth Fludd of the Norwalk police department observed two shell casings in close proximity to Rowley's body and a spent

bullet on the stairs. A total of four nine millimeter cartridges were found at the crime scene. An autopsy revealed that Rowley had been shot three times, and bullet fragments were recovered from his body. James Stephenson, a firearms and tool mark examiner at the state forensic science laboratory, testified that two of the bullets were fired from the same firearm, that the bullet fragments were consistent with having been fired from the same type of firearm as those two bullets and that the four nine millimeter cartridges were fired from the same firearm. Stephenson concluded that all of the ballistics evidence indicated that one firearm was utilized in the shooting.

The defendant was arrested on November 28, 2001. After the defendant signed a warning and waiver form pertaining to his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Detective Thomas Roncinske of the Norwalk police department interviewed him at approximately 10 a.m. The defendant stated that he was at Roodner Court at the time of the shooting. He stated further that he had asked Rowley to move his vehicle and "that's all he knew."

Sergeant Thomas Matera next interviewed the defendant at 2:15 p.m. The defendant again reviewed and signed a *Miranda* rights warning and waiver form prior to the interview. The defendant initially indicated that he had no knowledge of the shooting. As the interview progressed, however, the defendant stated that he had a conversation with Rowley at Roodner Court around 7 p.m. on the evening of the shooting and that Rowley had loaned him money to purchase marijuana. The defendant stated that he then purchased marijuana and alcohol, which he consumed with a friend at Roodner Court. He stated that, later in the evening, he went to apartment 3B in search of Rowley and told him to move his vehicle, and then left the building via the back door, which was propped open by a piece of wood. He stated that he heard gunshots after exiting the building and

headed to an adjacent building, where he met with Kevin Preston (Preston) and a woman named Taisha. At that point, the interview was concluded at the defendant's request.

Roncinske interviewed the defendant a third and final time on November 28, 2001, at 10 p.m. Again, the defendant signed a *Miranda* rights warning and waiver form prior to the interview. The defendant's story changed considerably from that which he had provided earlier in the day. At this interview, the defendant stated that he had met with Patterson and Preston at 9 p.m. on the evening of the shooting, at which point Patterson asked him if he knew where to find Rowley. The defendant stated that "there had been a problem with a narcotics transaction between Patterson and Rowley." After telling Patterson that Rowley was in an apartment in building sixteen, the defendant stated that Patterson and Preston asked him to get Rowley out of the apartment.

The defendant stated that, prior to the shooting, he saw Patterson and Preston outside the door to building sixteen. When asked what he thought they were planning to do to Rowley, the defendant replied that they "were going to f___ him up."

The defendant then told Patterson and Preston that he "would go up to building sixteen, knock on the apartment door where Rowley was, tell him the police were going to put a ticket on his car." The defendant stated that he then did so. He stated that after exiting the apartment, he went down the stairs and saw the back door propped open by a piece of wood. Standing in the doorway were Patterson and Preston. The defendant stated that, once outside the building, he heard gunfire. The defendant stated that he spoke with Patterson on his cellular telephone following the shooting and discussed the incident. He further stated that although he

had seen Patterson with guns before, he did not want that fact included in his statement.

The defendant was charged by information with manslaughter in the first degree with a firearm, conspiracy to commit murder and commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k.[3] At trial, the defendant filed a motion for acquittal, which the court denied. After a trial by jury, the defendant was convicted of manslaughter in the first degree with a firearm, and the jury made a finding that he had committed a class A, B or C felony with a firearm. He was acquitted of the charge of conspiracy to commit murder. The court thereafter sentenced the defendant to a total effective term of thirty years imprisonment. This appeal followed.

I

The defendant first alleges evidential insufficiency. He claims that the court improperly denied his motion for a judgment of acquittal because there was insufficient evidence to prove the elements of manslaughter in the first degree with a firearm beyond a reasonable doubt. We disagree.

Our review standard of evidential insufficiency claims employs a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if

---

[3] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years . . . ."

there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517, 782 A.2d 658 (2001).

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Rivera*, 90 Conn. App. 312, 316, 876 A.2d 606, cert. denied, 275 Conn. 925, 883 A.2d 1250 (2005).

Finally, "we must remember that it is the jurors who are the arbiters of fact. [W]e do not sit as the [thirteenth] juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict of guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v.

*Glasper*, 81 Conn. App. 367, 372, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004). With that standard in mind, we turn to the defendant's claims.

A

The defendant first alleges that the evidence was insufficient to establish that he intended the use of a firearm. His claim requires us to consider the elements of the crime of manslaughter in the first degree with a firearm. It is axiomatic that the jury must find every element proven beyond a reasonable doubt in order to find a defendant guilty of the charged offense. See, e.g., *State* v. *Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). It is further undisputed that "there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility." (Internal quotation marks omitted.) *State* v. *Henry*, 253 Conn. 354, 361, 752 A.2d 40 (2000). "[A]ccessorial liability is predicated upon the actor's state of mind at the time of his actions, and whether that state of mind is commensurate to the state of mind required for the commission of the offense." *State* v. *Foster*, 202 Conn. 520, 532, 522 A.2d 277 (1987). Our Supreme Court has explained that a conviction under our accessorial liability statute requires proof of a dual intent, namely, "that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to commit the offense with which he is charged." (Emphasis in original; internal quotation marks omitted.) Id., 525–26; see also *State* v. *Delgado*, 247 Conn. 616, 621, 725 A.2d 306 (1999). Moreover, in *State* v. *Crosswell*, 223 Conn. 243, 261 n.14, 612 A.2d 1174 (1992), our Supreme Court made it clear that in stating this proposition, in prosecutions charging criminal liability on the basis of accessorial involvement, it did not expand the essential elements of intent to require more to be proved against an accessory than would be required to convict the principal.

In this appeal, the parties dispute the requisite elements of the crime of manslaughter in the first degree with a firearm under § 53a-55a. As to intent, the state maintains that when one is charged as an accessory, it is required to prove only that (1) the defendant intended to inflict serious physical injury and (2) intended to aid another in doing so. In contrast, the defendant maintains that when charged with a violation of § 53a-55a (a) as an accessory in violation of § 53a-8, the state must also prove that the actor intended the use of a firearm. A careful reading of Connecticut precedent undermines the defendant's contention.

The defendant's argument centers on the concurrence of Justice Shea in *State* v. *McCalpine*, 190 Conn. 822, 833, 463 A.2d 545 (1983).[4] *McCalpine* involved a conviction for, inter alia, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), which is committed by one "armed with a deadly weapon . . . ." On appeal, the defendant in that case posited that the intent element of § 53a-8 required that the accessory possess the intent to aid the commission of the basic crime *as well* as the aggravating circumstance. *State* v. *McCalpine*, supra, 831. The argument thus presented a tripartite intent requirement, which he described as the "intent for robbery, the intent to aid a robbery and the intent that a deadly weapon be possessed." Id. The *McCalpine* majority disagreed. It stated that "[t]o establish the guilt of an accused as an accessory . . . the state must prove criminality of intent and community of unlawful purpose. . . . The mental state . . . incorporated in § 53a-8 does not require that the accused know of or endorse every act of his coparticipant in crime." (Citation omitted.) Id., 832. The majority then distinguished *State* v. *Harrison*, 178 Conn. 689, 425 A.2d 111 (1979), concluding that "[c]ontrary to the

---

[4] The defendant conceded at oral argument that no other Connecticut authority exists in support of his contention.

defendants' allegations, [*Harrison*] imposed no requirement that the accessory possess . . . the intent to possess a deadly weapon." *State* v. *McCalpine,* supra, 832–33.

In his concurrence, Justice Shea departed from that conclusion. Reasoning that "the mental state required of an accomplice who is charged with a crime [cannot be] less than that which must be proved against a principal"; id., 833 (*Shea, J.,* concurring); Justice Shea stated that "[t]his requirement must extend to those acts which enhance the degree of the crime as well as to those which constitute the basic crime itself. Otherwise an accomplice might be convicted of an offense although he did not entertain the same mental state required by statute for conviction of the principal." Id., 834.

Our Supreme Court revisited *McCalpine* in *State* v. *Crosswell,* supra, 223 Conn. 243. The court noted that "our statement [in *McCalpine*] about the intent of an accessory was dictum, in light of the elements of the crime at issue . . . ." Id., 258. Taking a "literal view of the plain language of the accessory statute," the court adopted, only in part, the position taken by Justice Shea in his *McCalpine* concurrence. Id., 261. It explained: "[C]omplicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respect to the result to the extent demanded by the definition of the crimes. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if death results, even though the principal actor's liability is at a different level. In effect, therefore, the homicidal act is attributed to both participants, with the liability of each measured by his own degree of culpability toward the result." (Internal quotation marks omitted.) Id., 260.

At the same time, then Chief Justice Peters, writing for the court, clarified that the requirement under § 53a-

8 that the accomplice act with the mental state required for commission of an offense "drops out of the calculation when the aggravating circumstance does not require proof of any particular mental state." Id., 258 n.11. By way of example, she referred to *McCalpine*, which involved a robbery under § 53a-134 (a) (2). Id. The aggravating circumstance of that offense is participation in the robbery by one armed with a deadly weapon. The court stated that "[i]ntent [is] not an element of the aggravating circumstance provided by [that] criminal statute . . . ." Id. *Crosswell* further stated that "[n]othing in *State* v. *Foster*, [supra, 202 Conn. 520], conflicts with the holding in *State* v. *McCalpine*, [supra, 190 Conn. 822], that when a defendant is charged with robbery in the first degree on the basis that 'he or another participant in the crime . . . is armed with a deadly weapon'; General Statutes § 53a-134 (a) (2); the defendant need not be proven to have intended to possess a deadly weapon. The concurrence in *McCalpine* also disagreed with that proposition, but it has not been questioned in any decision by this court." *State* v. *Crosswell*, supra, 223 Conn. 261 n.14.

The Supreme Court reaffirmed that principle in *State* v. *Avila*, 223 Conn. 595, 613 A.2d 731 (1992), which also involved a conviction under § 53a-134 (a) (2). The defendant in *Avila* argued that as "the intent required for commission of the crime of robbery in the first degree includes the intent that a participant in the robbery be armed with a deadly weapon"; id., 609; a jury, "in order to convict the defendant of robbery in the first degree as an accessory . . . must find proven beyond a reasonable doubt that he was aware that one of the other participants in the crime was armed with a deadly weapon." Id., 608. The court disagreed, noting that an "identical claim" was unsuccessful in *McCalpine*. Id., 609. Although the defendant claimed that the precedential force of *McCalpine* had been eroded, the court

thought otherwise. It explained: "[W]e recently stated [that] the cases subsequent to *McCalpine* do not conflict with *McCalpine*'s holding that when a defendant is charged with robbery in the first degree on the basis that he or another participant in the crime . . . is armed with a deadly weapon . . . the defendant need not be proven to have intended to possess a deadly weapon."[5] (Citation omitted; internal quotation marks omitted.) Id.

Like *McCalpine*, the present case involves a criminal statute in which the aggravating circumstance, the use of a weapon, does not require proof of any particular mental state. Section 53a-55a (a) provides in relevant part that "[a] person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ." Thus, to commit the offense, "a defendant either must (1) use a firearm; (2) be armed with and threaten the use of a firearm; or (3) display or represent by his words or conduct that he possesses a firearm." *State* v. *Tomlin*, 266 Conn. 608, 625, 835 A.2d 12 (2003). Contrary to the contention of the defendant, that element is not encompassed within the dual intent requirement of § 53a-8, but rather is merely an aggravating circumstance that does not require proof of any particular mental state.[6] In the context of robbery in the first

---

[5] New York courts agree. See, e.g., *People* v. *Gage*, 259 App. Div. 2d 837, 839, 687 N.Y.S.2d 202 (requisite intent remains same whether robber commits first, second or third degree robbery offense; state bears no greater burden to establish culpable mental state when defendant charged with first degree robbery compared to second or third degree robbery; it is presence of statutorily designated aggravating factors that elevates severity of crime), leave to appeal denied, 93 N.Y.2d 924, 715 N.E.2d 510, 693 N.Y.S.2d 507 (1999).

[6] Our Supreme Court has stated that "[d]espite the common-law presumption that criminal offenses require some degree of criminal intent . . . this court has held that the legislature may, if it so chooses, ignore the common-

degree, the display or threatened use of a firearm constitutes an aggravating circumstance; see *State* v. *Coston*, 182 Conn. 430, 435, 438 A.2d 701 (1980); as does the act of being armed with a firearm. See *State* v. *Crosswell*, supra, 223 Conn. 258 n.11. Likewise, the use, threatened use or display by a participant who "represents by his words or conduct that he possesses a . . . firearm" under § 53a-55a constitutes aggravating conduct that triggers a mandatory term of imprisonment.[7]

Furthermore, this court rejected a similar claim in *State* v. *Tucker*, 9 Conn. App. 161, 517 A.2d 640 (1986), in which the defendant was convicted of assault in the second degree as an accessory. The defendant in that case argued that General Statutes § 53a-60 (a) (2)[8] required "not only an intent to cause physical injury to another person but also an intent that the injury be caused by means of a dangerous instrument or a deadly weapon." *State* v. *Tucker*, supra, 167. We disagreed,

---

law concept that criminal acts require the coupling of the evil-meaning mind with the evil-doing hand and may define crimes which depend on no mental element, but consist only of forbidden acts or omissions." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilchinski*, 242 Conn. 211, 229, 700 A.2d 1 (1997).

[7] General Statutes § 53a-55a (b) provides: "Manslaughter in the first degree with a firearm is a class B felony and any person found guilty under this section shall be sentenced to a term of imprisonment in accordance with subdivision (4) of section 53a-35a of which five years of the sentence imposed may not be suspended or reduced by the court." The offense of manslaughter in the first degree with a firearm was enacted in 1975 as part of "An Act Concerning the Offenses with Firearms." See Public Acts 1975, No. 75-380, § 3. Senator David Barry introduced the legislation by explaining that "these new crimes which add the words with a firearm to it [are] tied into the existing criminal statutes that are similar except [that they] do not involve a firearm. . . . [T]he purpose of this [b]ill is . . . to require [a] mandatory sentence that may not be suspended or reduced by the [c]ourt." 18 S. Proc., Pt. 5, 1975 Sess., p. 2292. ·

[8] General Statutes § 53a-60 (a) provides: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm . . . ."

noting that our Supreme Court "has refrained from expanding the intent requirement to include the intent to cause the intended harm with a dangerous weapon." Id., 168. We therefore hold that there is a dual intent required for commission of the crime of manslaughter in the first degree with a firearm as an accessory, namely, that the defendant intended to inflict serious physical injury and that he intended to aid the principal in doing so. When a defendant is charged with a violation of § 53a-55a (a) on the ground that "he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm"; General Statutes § 53a-55a (a); the state need not prove that the defendant intended the use, carrying or threatened use of the firearm. Although an element of the crime, proof of it is satisfied if the defendant in fact used the firearm. The defendant's claim, therefore, fails.

B

The defendant next claims that the evidence was insufficient to establish that he intended to cause serious physical injury as required by §§ 53a-55a and 53a-55. His claim is unavailing.

The jury in this case heard evidence concerning statements made by the defendant during three interviews conducted on November 28, 2001, each of which were preceded by the defendant signing a *Miranda* rights warning and waiver form. The defendant stated that he had met with Patterson and Preston at 9 p.m. on the evening of the shooting, at which point Patterson asked him if he knew where to find Rowley. The defendant was aware that there had been a problem between Patterson and Rowley. After telling Patterson that Rowley was in an apartment in building sixteen, the defendant stated that Patterson and Preston asked him to

get Rowley out of the apartment, to which he agreed. The defendant stated further that, prior to the shooting, he saw Patterson and Preston outside the door to building sixteen. When asked what he thought they were planning to do to Rowley, the defendant replied that they "were going to f___ him up." The defendant stated that he then proceeded to apartment 3B, spoke with Rowley and exited the apartment. As he headed down the stairs of building sixteen, he saw Patterson and Preston standing in the back doorway. The defendant stated that, once outside the building, he heard gunfire. The defendant stated that he spoke with Patterson on his cellular telephone following the shooting and discussed the incident.

The jury also heard testimony from Addison, who stated that she was standing outside when the gunshots erupted inside building sixteen. She testified that she then saw the defendant exit the building, and that, as she ran into the building, the defendant "was walking normal like nothing happened. His head was down. His hands were down. He didn't look at me." In addition, Ramos testified that, shortly after the shooting, the defendant reentered building sixteen as paramedics treated Rowley. At that time, the defendant asked with a smirk on his face, "Who got shot?"

Roncinske also testified that after the defendant stated that "they were going to f___ him up," Roncinske replied that "they meant they were going to do something serious to him, not just a quick beating or anything like that." When asked how the defendant responded, Roncinske testified that "he never disagreed with me." "[I]n Connecticut . . . when a statement, accusatory in nature, made in the presence and hearing of an accused, is not denied or explained by him, it may be received into evidence as an admission on his part." *State* v. *Daniels*, 18 Conn. App. 134, 138, 556 A.2d 1040 (1989). Moreover, "[w]hile a defendant may invoke his

right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain 'selectively' silent." *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985); *State* v. *Torres*, 85 Conn. App. 303, 315–16, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004).

From those facts, the jury reasonably could have inferred that the defendant was not surprised when Rowley was shot. The jury was free to credit the testimony that, as gunshots rang out, the defendant simply walked away "like nothing had happened" and the testimony that he returned to the scene of the crime smirking moments later. That factual scenario, as well as his silence when Roncinske stated that "they were going to do something serious to him," informs the jury's understanding of what the defendant meant when he stated that he knew Patterson and Preston "were going to f___ [Rowley] up." We therefore conclude that sufficient evidence existed to support the jury's conclusion that the defendant intended to cause serious physical injury to Rowley. For that reason, the court properly denied the defendant's motion for acquittal.

## II

The defendant next challenges the admission of Montanez' statement that Rowley told her that "[t]hey're trying to f___ him over for that thing with [Johnson]" as violative of his sixth amendment right to confrontation.[9] The defendant did not object at trial and now seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10] *Golding*

---

[9] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."

[10] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right;

instructs that this court is free to respond to the defendant's claim "by focusing on whichever condition is most relevant in the particular circumstances." Id., 240. We conclude that the defendant's claim fails *Golding*'s third prong.

"[T]he state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . [It] guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." (Citation omitted; internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 816, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "The right to confrontation secures to the defendant the opportunity to cross-examine witnesses against him . . . and to expose to the jury the facts from which the jurors . . . could appropriately draw inferences relating to the reliability of the witness." (Citation omitted; internal quotation marks omitted.) *State* v. *Hufford*, 205 Conn. 386, 401, 533 A.2d 866 (1987).

"Traditionally, for purposes of the confrontation clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement bore 'adequate indicia of reliability.' *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)." *State* v. *Rivera*, 268 Conn. 351, 362, 844 A.2d 191 (2004). In a sea change in sixth amendment jurisprudence, the United States Supreme Court in *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct.

---

(3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. *Golding*'s first two prongs relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review. *State* v. *Jarrett*, 82 Conn. App. 489, 492 n.1, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

1354, 158 L. Ed. 2d 177 (2004), overruled, in part, *Ohio v. Roberts*, supra, 56. In *Crawford*, the court "rede-fine[d] the scope and effect of the Confrontation Clause . . . ." *United States v. Saget*, 377 F.3d 223, 226 (2d Cir. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 938, 160 L. Ed. 2d 821 (2005). In reframing its purpose and scope, the court "determined that the clause's predomi-nant objective . . . is preventing the admission of testi-monial statements against criminal defendants who never had an opportunity to cross-examine the declar-ant." *United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005). The court thus held that no prior testimonial statement made by a declarant who does not testify at the trial may be admitted against a defendant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him or her. *Crawford v. Washington*, supra, 59. At the same time, "*Crawford* leaves the *Roberts* approach untouched with respect to nontestimonial statements." *United States v. Saget*, supra, 227. Our inquiry into whether the intro-duction of Rowley's statement violates the confronta-tion clause must therefore begin with a consideration of whether the challenged statement was "testimonial," as that term is used in *Crawford*.[11]

The *Crawford* court expressly declined to "spell out a comprehensive definition of 'testimonial.' " *Crawford v. Washington*, supra, 541 U.S. 68. However, it held that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. By contrast, it does not apply to a casual remark made to an acquain-tance. Id., 51. Beyond that, the court left "for another day" the question of precisely what constitutes testimo-nial hearsay.[12] Id., 68.

---

[11] Although it seems counterintuitive to describe something that in most instances will be admitted as testimony in a court of law as "nontestimonial," we use that established terminology.

[12] In his concurrence, the late Chief Justice Rehnquist lamented that the *Crawford* decision "casts a mantle of uncertainty over future [federal and

In the wake of *Crawford*, courts across the country have grappled with the meaning of testimonial hearsay. The United States Court of Appeals for the Second Circuit tackled the issue in *United States* v. *Saget*, supra, 377 F.3d 223.[13] It observed that "the types of statements cited by the [*Crawford* court] as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings" and noted further that *Crawford* "suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial." Id., 228. The Second Circuit thus reasoned that "the [United States Supreme] Court would use the reasonable expectation of the declarant as the anchor of a more concrete definition of testimony." Id., 229. Other federal courts agree. See *United States* v. *Hinton*, 423 F.3d 355, 360 (3d Cir. 2005) ("statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial are testimonial"); *United States* v. *Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) ("We conclude that

state] criminal trials . . . ." *Crawford* v. *Washington*, supra, 541 U.S. 69. He continued: "The Court grandly declares that [w]e leave for another day any effort to spell out a comprehensive definition of testimonial . . . . But the thousands of federal prosecutors and the tens of thousands of state prosecutors need answers as to what beyond the specific kinds of testimony the Court lists . . . is covered by the new rule. They need them now, not months or years from now." (Citations omitted; internal quotation marks omitted.) Id., 75 (Rehnquist, C. J., concurring). As one court has noted, "the same is true of judges." *Hammon* v. *State*, 829 N.E.2d 444, 453 (Ind.), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005).

[13] "Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive." *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000); see also *State* v. *Spencer*, 268 Conn. 575, 610, 848 A.2d 1183 (opinions of Second Circuit entitled to significant deference), cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004).

the 'common nucleus' present in the formulations which the Court considered centers on the reasonable expectations of the declarant. It is the reasonable expectation that a statement may be later used at trial that distinguishes the flippant remark, proffered to a casual acquaintance . . . from the true testimonial statement" [citation omitted]); *United States* v. *Pugh*, 405 F.3d 390, 399 (6th Cir. 2005) (finding declarant's positive identification of defendant to be "testimonial" because it was given during a police interrogation, was made to a government officer, and because "any reasonable person would assume that a statement that positively identified possible suspects in a picture of the crime scene would be used against those suspects in either investigating or prosecuting the offense"); *United States* v. *Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) ("The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."); *Horton* v. *Allen*, 370 F.3d 75, 83–84 (1st Cir. 2004) (defendant's private conversation with friend, previously admitted under state of mind exception to hearsay rule, held to be nontestimonial because it was private, did not involve formalized documents, was not made under examination and was not made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" [internal quotation marks omitted]), cert. denied, 543 U.S. 1093, 125 S. Ct. 971, 160 L. Ed. 2d 905 (2005). The Second Circuit further has interpreted *Crawford* to cover "sworn evidentiary statements, such as affidavits, depositions, grand jury testimony, and trial testimony, as well as unsworn declarations given to the police." *Mungo* v. *Duncan*, 393 F.3d 327, 332 n.2 (2d Cir. 2004),

cert. denied sub nom. *Mungo* v. *Greene*, 544 U.S. 1002, 125 S. Ct. 1936, 161 L. Ed. 2d 778 (2005).

The statement at issue in the present case does not qualify as either testimony at a preliminary hearing, testimony before a grand jury or testimony at a former trial, nor was it obtained via police interrogation. See *Crawford* v. *Washington*, supra, 541 U.S. 68. Rather, it was the sort of remark to an acquaintance that the *Crawford* court proclaimed to be nontestimonial. Id., 51. The courts of this land, both federal and state, are in agreement that statements made to friends in unofficial settings do not constitute testimonial hearsay. See *Evans* v. *Luebbers*, 371 F.3d 438, 444–45 (8th Cir. 2004) (statements made by victim to acquaintances prior to death nontestimonial), cert. denied sub nom. *Evans* v. *Roper*, 543 U.S. 1067, 125 S. Ct. 902, 160 L. Ed. 2d 800 (2005); *United States* v. *Franklin*, supra, 415 F.3d 545 (statement to friend nontestimonial); *United States* v. *Saget*, supra, 377 F.3d 229 ("statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*"); *United States* v. *Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004) ("[Nightclub employee's] comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"); *People* v. *Smith*, 135 Cal. App. 4th 914, 924, 38 Cal. Rptr. 3d 1 (2005) (statement made to girlfriend in motel room not testimonial); *People* v. *Griffin*, 33 Cal. 4th 536, 579 n.19, 15 Cal. Rptr. 3d 743, 93 P.3d 344 (2004) (statement made to friend at school not testimonial); *Compan* v. *People*, 121 P.3d 876, 881 (Colo. 2005) (en banc) (victim's informal statement to friend nontestimonial); *Lopez* v. *State*, 888 So. 2d 693, 699 (Fla. App. 2004) (statement to friend or family member nontestimonial); *Womack* v. *State*, 273 Ga. App. 300, 305, 614 S.E.2d 909 (statement to girlfriend that declarant had been involved in armed

robbery nontestimonial), cert. denied, 2005 Ga. LEXIS 551 (September 19, 2005); *Hammon* v. *State*, 829 N.E.2d 444, 454 (Ind.) (statement to friend, family member or coworker nontestimonial), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005); *People* v. *Paul*, 25 App. Div. 3d 165, 169–70, 803 N.Y.S.2d 66 (2005) (statements volunteered to friends, acquaintances or neighbors nontestimonial); *State* v. *Saechao*, 195 Ore. App. 581, 585–86, 98 P.3d 1144 (statement made to friend during telephone conversation from county jail nontestimonial), review denied, 337 Ore. 669, 104 P.3d 601 (2004). Plainly, Rowley's statement to Montanez was nontestimonial. As such, the *Roberts* test governs our analysis of the defendant's claim. See *United States* v. *Saget*, supra, 227.

Rowley's statement to Montanez satisfies that test. Having died as a result of the gunshot wounds he suffered at Roodner Court on November 27, 2001, Rowley undoubtedly was unavailable to testify at the defendant's trial. The critical inquiry, then, is whether his statement to Montanez bore adequate indicia of reliability. We conclude that it did.

First and foremost, the fact that the statement was made to a close friend is indicative of its reliability. In *United States* v. *Matthews*, 20 F.3d 538, 546 (2d Cir. 1994), the Second Circuit concluded that the declarant's statements to his girlfriend were sufficiently reliable to be introduced against the defendant, given the unofficial setting in which the remarks were made and the declarant's friendly relationship with the listener. That same court reached a similar conclusion in *United States* v. *Saget*, supra, 377 F.3d 230, in which the declarant "believed he was speaking with a friend . . . in a private setting." See also *State* v. *Pierre*, 277 Conn. 42, 69–70, 890 A.2d 474 (2006) (statements defendant's friend made to individual who was a friend and someone he routinely socialized with are trustworthy); *State* v.

*Rivera,* supra, 268 Conn. 369 (speaking to acquaintances unconnected to law enforcement makes statements eminently trustworthy). Second, Rowley made the statement in confidence and on his own initiative. As our Supreme Court has noted, "[s]uch statements are significantly more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial." (Internal quotation marks omitted.) Id., 370. Last, and most important, the precise timing of Rowley's statement bolsters its reliability. Indeed, the statement was made *prior* to his shooting on November 27, 2001. If "declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance"; *State* v. *Bryant,* 202 Conn. 676, 699, 523 A.2d 451 (1987); then the fact that Rowley uttered the statement days before he was shot certainly is significant. In light of the foregoing, we conclude that Rowley's statement to Montanez bore adequate indicia of reliability, thereby satisfying the *Roberts* test. Consequently, the defendant's claim fails to satisfy *Golding*'s third prong.[14]

### III

The defendant's final claim is that the court violated his right to present a defense by precluding certain evidence regarding Rowley's alleged drug activity. We conclude that the court did not abuse its discretion in excluding that evidence.

As we recently observed, "[a] defendant's right to present a defense does not include a right to present evidence that properly is excluded under the rules of evidence." *State* v. *Sun,* 92 Conn. App. 618, 629, 886

---

[14] Moreover, we note that even were we to decide otherwise, admission of Montanez' statement was harmless under *Golding*'s fourth prong in light of the substantial evidence presented to the jury in the present case.

A.2d 1227 (2005). "The sixth amendment to the United States constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Wright,* 273 Conn. 418, 424, 870 A.2d 1039 (2005).

"The standard of review we apply to a trial court's evidentiary rulings is well settled. Such rulings are entitled to great deference. . . . The trial court is given broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Madsen* v. *Gates,* 85 Conn. App. 383, 399, 857 A.2d 412, cert. denied, 272 Conn. 902, 863 A.2d 695 (2004). In our review, we make every reasonable presumption in favor of upholding the trial court's ruling. *State* v. *Watts,* 71 Conn. App. 27, 34, 800 A.2d 619 (2002).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all

other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 261–62, 796 A.2d 1176 (2002). The determination of whether a matter is relevant to a material issue rests within the sound discretion of the trial court. See *State* v. *Daniels*, 83 Conn. App. 210, 218, 848 A.2d 1235, cert. denied, 270 Conn. 913, 853 A.2d 528 (2004).

Certain additional facts are relevant to this claim. At the close of the state's case-in-chief, the defendant filed a motion to offer certain evidence. In that motion, he sought to introduce, through the testimony of Roncinske, that the owner of Rowley's vehicle was Hocki Mendez, that the license plates on Rowley's vehicle were registered to a different vehicle owned by Shakha Moore and that eleven pieces of suspected crack cocaine had been found in Rowley's vehicle.[15] The defendant proffered two interrelated grounds for the motion. First, although he did not testify at trial, the defendant alleged that his credibility had been placed in issue by the state. Second, he stated that "the defense believes the state intends to argue to the jury that the defendant's alleged statement to the victim shortly before his death that 'the police are messing with your car' was a lie, and therefore, to argue that this is evidence of his criminal intent and design to lure Rowley from the apartment for a criminal purpose." The court denied the defendant's motion, concluding that the evidence was irrelevant.

The defendant has failed to demonstrate, either before the trial court or this court, that the evidence of drug activity on the part of Rowley was relevant to the issue before the jury. The gist of the defendant's

---

[15] No field tests were performed on the substance, nor does the record include any toxicological evidence as to its nature.

claim surrounds a factual dispute over the precise language used by the defendant when he entered apartment 3B. At trial, Ramos testified that after waking Rowley with a punch to the chest, the defendant stated that "the cops are f___ing with your car." Matera testified that when asked about that statement, the defendant "said he didn't say that."[16] That factual dispute has little bearing on the issue before us. Irrespective of the precise nomenclature employed, it is uncontested that the defendant entered the apartment and spoke to Rowley in an effort to draw him out of the apartment. After Patterson and Preston asked him to get Rowley out of apartment 3B, the defendant told them that he "would go up to building sixteen, knock on the apartment door where Rowley was, tell him the police were going to put a ticket on his car." The defendant proceeded to do so, knowing that Patterson and Preston intended to "f___ [Rowley] up."

The defendant concedes that the only element of the crime of manslaughter in the first degree with a firearm at issue in the present case was whether he possessed the requisite mental state, in this case the intent to cause serious physical injury. He argues that evidence that Rowley had narcotics in his vehicle or license plates thereon that were registered to a different vehicle at the time of the shooting tends to negate the required intent on his part. We disagree. To be relevant, the evidence had to possess a logical tendency to aid the jury in the determination of whether the defendant intended to cause serious physical injury. Put simply, the necessary nexus between the evidence and that required mental state is absent. "Evidence is irrelevant if there is 'such a want of open and visible connection

---

[16] The defendant's denial when interviewed by Matera contradicts his later statement to Roncinske that he told Patterson and Preston that he "would go up to building sixteen, knock on the apartment door where Rowley was, tell him the police were going to put a ticket on his car."

between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in proof of the latter.' *State* v. *Kelly*, 77 Conn. 266, 269, 58 A. 705 (1904)." *State* v. *Jeffrey*, 220 Conn. 698, 704, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992). We agree with the court that the fact that improper license plates or a cocaine like substance was later found in Rowley's vehicle, as well as the fact that Rowley did not actually own the vehicle, had no relevance to the issue before the jury. We therefore conclude that the court properly exercised its discretion to preclude the evidence in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.