## S99A0707. LIVINGSTON v. THE STATE.
### (524 SE2d 222)

HINES, Justice.

A jury found Howard Kelly Livingston guilty of malice murder, felony murder, kidnapping with bodily injury, aggravated battery, five counts of aggravated assault, theft by taking a motor vehicle, arson in the second degree, influencing a witness, concealing a death, and two counts of possession of a firearm in the commission of a felony in connection with the death of Keith Lloyd Evans. Livingston appeals his convictions, challenging the sufficiency of the evidence; an adverse *Batson* ruling; the admission of certain pre-confession statements and other testimonial and documentary evidence characterized as hearsay; and the alleged denial of cross-examination. Finding the challenges to be without merit, we affirm.[1]

---

[3] See *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[1] The crimes occurred on April 13, 1991. Livingston was indicted for the crimes, along with Tommy Lee Waldrip and John Mark Waldrip, during the February 1991 term of the Dawson County grand jury. Initially, the State sought imposition of the death penalty for Livingston but then withdrew its notice of intent to do so following this Court's decision on interim review of Livingston's case and the cases against his co-indictees. *Livingston v. State,* 264 Ga. 402 (444 SE2d 748) (1994). Tommy Lee Waldrip was found guilty and sentenced to death for malice murder in October 1994, and his convictions and death sentence

Livingston's nephew, John Mark Waldrip, and Robert Garner were the primary suspects in the 1989 armed robbery of Keith Lloyd Evans, an assistant office manager at a grocery store in Cumming. John Mark was charged with the offense, and was tried in October 1990. Evans, who was the only eyewitness, testified at trial and identified John Mark as the armed robber. John Mark was convicted. But John Mark was eventually granted a new trial and also granted bond pending retrial. His new trial was scheduled for April 15, 1991. Evans intended to testify at the new trial.

On April 3, 1991, Garner, who was then incarcerated, agreed to testify against John Mark at the upcoming trial, and John Mark's attorney was so notified. Around April 6, John Mark went to the Forsyth County jail, and asked an acquaintance, Thomas Hitchcock, who was incarcerated there, to inform him if Garner was brought to the jail for the retrial. Garner was brought to the Forsyth County jail on April 12.

On April 13, 1991, Livingston, John Mark, and Tommy Waldrip, who was Livingston's brother-in-law and John Mark's father, drove to Cleveland, Georgia, to purchase a used car. Almost immediately after the purchase, the men returned the vehicle because of mechanical problems, and left at approximately 5:00 p.m. The three were driving a Ford Tempo at the time, and at about 7:00 p.m., Tommy and John Mark dropped Livingston off at a location near his mother's home in Lumpkin County. The Waldrips then returned to their apartment in Dawsonville.

Later that evening, at 7:42 p.m., Hitchcock made a collect telephone call from the Forsyth County jail to John Mark; Hitchcock alerted John Mark that Garner was in the cell block with him. Hitchcock called Garner to the telephone and John Mark stated to Garner that "my attorney says you are going to testify against me. . . . Well,

---

were affirmed. *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997). John Mark Waldrip was convicted and sentenced to multiple life terms of imprisonment in May 1995, and his convictions were affirmed. *Waldrip v. State*, 266 Ga. 874 (471 SE2d 857) (1996). Livingston's first trial commenced on September 11, 1995, and concluded with guilty verdicts on all counts and sentencing on October 11, 1995. This Court reversed the convictions on July 14, 1997. *Livingston v. State*, 268 Ga. 205 (486 SE2d 845) (1997). Livingston was retried November 3-18, 1997, and found guilty of malice murder and the remaining charges. On November 18, 1997, Livingston was sentenced to consecutive terms of life imprisonment for malice murder and kidnapping with bodily injury, and collectively 45 years and 12 months incarceration for theft by taking a motor vehicle, second degree arson, influencing a witness, concealing a death, and the firearm possession charges. The felony murder stood vacated by operation of law, and the remaining charges were found merged for the purpose of sentencing. See *Malcolm v. State*, 263 Ga. 369, 372-374 (5) (434 SE2d 479) (1993). A motion for new trial was filed on December 17, 1997, amended on November 6, 1998, and denied on December 3, 1998. The notice of appeal was filed on December 31, 1998, and the appeal was docketed in this Court on February 12, 1999. The case was submitted for decision without oral argument on April 5, 1999.

I worked too hard on this case and, you know, don't burn me like that." At one point, John Mark interrupted the exchange to confer with his father, Tommy. Garner was nervous during the conversation and finally assured John Mark that he would not testify against him. John Mark asked that Hitchcock be put back on the telephone.

Also that night, around 9:00 p.m., Tommy returned to Livingston's mother's home and helped Livingston load some personal effects into Tommy's car. Tommy and Livingston left between 9:30 p.m. and 10:00 p.m.

That night of April 13, the victim, Evans, was last seen alive when he clocked out of work at the grocery store at 10:28 p.m. and left the parking lot in his red pickup truck approximately five minutes later. Before leaving, Evans telephoned his mother and told her that he would be coming straight home. The route from the grocery store to Evans' home was along Highway 9 into Dawson County.

Around midnight, a Dawsonville resident spotted Evans' pickup truck engulfed in fire on the side of Highway 52 in Dawson County, and reported the fire. Fire and law enforcement personnel were dispatched. Police found various items near the burning vehicle, including a fluid-container cap that smelled like a gasoline-type product, a wheel weight, and a current insurance card issued to Tommy's wife and Livingston's half-sister, Linda Waldrip, for a 1988 Ford Tempo.

Upon questioning, the Waldrips and Livingston related various stories of their whereabouts and activities on the night of April 13. In his initial interview on April 14, 1991, John Mark told authorities that he had been playing pool with some friends that night, and had returned home around 11:15 p.m. When his friends did not corroborate this story, John Mark told police officials that he had spent the night with a married woman, but again maintained that he had returned home shortly after 11:00 p.m. Tommy told police that he picked up Livingston in Gainesville around 9:00 p.m., and returned home around 11:00 p.m. He later altered his story, stating that he in fact picked up Livingston in Dawsonville at 9:30 p.m., gave him a ride back to Gainesville, and returned home at approximately 11:00 p.m. Investigators later determined that this Dawsonville-Gainesville trip would take 42-48 minutes one way.

Prior to Livingston talking with authorities, on April 14, a call was placed from the Waldrips' Dawsonville apartment to Livingston's Gainesville boardinghouse. Later that evening, two separate calls were placed from a pay phone near Livingston's boardinghouse to the Waldrip apartment. On that day, John Mark was arrested for violating the conditions of his bond. When transferred to the Cumming City Jail on April 15, he told two cellmates that Evans was dead. At that time, authorities did not know of Evans' condition or whereabouts. Also, on April 15, Garner refused to testify at John Mark's

retrial for armed robbery because he was afraid to do so.

The police searched the Waldrips' Ford Tempo and discovered blood throughout the vehicle, a cigarette lighter, and a blood-stained gasoline container without a cap. The cap found beside Evans' burning truck fit the container. Police were directed to a dirt road in Dawson County, where they found a watch, a cassette tape case, a glove, a torn piece of Evans' shirt, blood that matched Evans' type, a clump of Evans' hair, tire tracks and broken glass from Evans' truck, and a spent 20-gauge shell. At this scene of apparent struggle, the police also discovered three sets of shoeprints, and Doral-brand cigarette butts.

On April 18, Evans' body was found in a shallow grave in Gilmer County. Another Doral-brand cigarette butt was found at the scene, as were a shovel and a 20-gauge shotgun. It was determined that the found shotgun could have fired the spent 20-gauge shell found on the dirt road. The autopsy revealed that Evans had sustained two gunshot blasts and blunt force trauma to the head. It also appeared that Evans had been dragged along the ground.

During further investigation into Evans' murder, police found a spent 20-gauge shotgun shell at a cabin in Gilmer County owned by Linda Waldrip. Police also found Doral-brand cigarettes in Livingston's residence.

After Livingston's arrest, he told police that he had ridden with Tommy Waldrip on the day of the murder. Livingston discussed with a cellmate the admissibility into evidence of boots Livingston had worn on the night of Evans' murder, and commented that "they'll put my ass in the electric chair." He also warned his cellmate that if the cellmate "messed" with him, he would "f___ your ass up just like we did that other son of a bitch."

1. Contrary to Livingston's contention, the evidence, though largely circumstantial, was sufficient to authorize a rational trier of fact to find Livingston guilty beyond a reasonable doubt of the malice murder of Evans and the related crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). That is so because when the evidence is viewed in the light most favorable to the jury's verdicts, the jury could have found that every reasonable hypothesis except Livingston's guilt was excluded. *Rushing v. State*, 271 Ga. 102, 105 (3) (515 SE2d 607) (1999); *Mullins v. State*, 269 Ga. 157 (1) (496 SE2d 252) (1998).

2. Livingston fails in his contention that the trial court erred in its ruling on his objections under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), to the State's use of two of its peremptory strikes against African-American prospective jurors. The trial court ruled that Livingston failed to make out a prima facie case of purposeful discrimination. After the trial court asked Livingston's

counsel to set forth a prima facie case, counsel responded only that Livingston's objection was based on the fact that the State exercised two of its six peremptory strikes against African-American prospective jurors.[2]

The challenging party makes out a prima facie case of purposeful discrimination by showing that " 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Cits.]" *Whatley v. State*, 266 Ga. 568, 570 (3) (468 SE2d 751) (1996). Even though "circumstantial evidence of invidious intent may include proof of disproportionate impact," numbers alone may not establish a disproportionate exercise of strikes sufficient to raise a prima facie inference that the strikes were exercised with discriminatory intent. *Whitaker v. State*, 269 Ga. 462, 464 (3) (499 SE2d 888) (1998), quoting *Batson*, supra, 476 U. S. at 93. What is more, the original pool of thirty venirepersons included two African-Americans, one of whom was struck and one of whom was chosen to serve. This left a greater proportion of African-Americans on the jury (1/12) than there was in the original pool (1/15). Further, one of the two African-American members of the venire in the alternate pool of eight was struck, and the other African-American venireperson was selected as one of the three alternates. Thus, the proportion of African-Americans serving as alternate jurors was higher (1/3) than the proportion of African-Americans in the original alternate pool (1/4).

Although it did not require it, the trial court then permitted the State to offer its reasons for striking the two potential jurors in order to perfect the record. Livingston complains that the trial court never determined that the explanations the State offered were actually race-neutral and did not allow Livingston to challenge the prosecution's explanations. But the complaints are unavailing. To begin with, Livingston was afforded the opportunity to respond to the State's explanations. What is more, " '[u]nless a discriminatory intent is inherent in the . . . proponent's explanation (for a strike), the reason offered will be deemed race neutral.' (Cits.)" *Jenkins v. State*, 269 Ga. 282, 290 (11) (498 SE2d 502) (1998), quoting *Jackson v. State*, 265 Ga. 897, 898 (2) (463 SE2d 699) (1995). There was no inherent discriminatory intent in the State's explanations. The State explained that one of the African-American venirepersons was struck because she had relatives who were then in trouble with the law and

---

[2] Counsel stated: "It appears 33 percent of their strikes were directed towards black people and if I am wrong then, you know, this won't be much of an appellate issue but that's what I submit and — I am sorry, actually that's not counting their strikes on the alternates. I apologize for that error as well. However, 50 percent of the black members that were eligible to be struck were indeed struck by the State and I submit that that makes out a prima facie case of discrimination."

had had a bad experience with law enforcement as well as the fact that the woman was hearing impaired; the State was concerned that her physical location in the jury box would enhance such impairment. The State then offered that it also struck a Caucasian venireperson because of hearing impairment. As to the other African-American venireperson at issue, the State explained that the man was struck because he was related to a criminal defendant whom its office was then prosecuting and that the defendant's family had been supportive of him and unhelpful to the prosecution. The State also related that any prospective juror, regardless of race, who was related to a defendant being prosecuted by its office would be similarly struck.

3. Livingston likewise fails in the contention that the trial court erred by allowing into evidence certain pre-confession statements by the Waldrips[3] under the exception to the hearsay rule for the statements of a co-conspirator because the State failed to present sufficient evidence that Livingston was involved in a conspiracy with the Waldrips.[4] "Under OCGA § 24-3-5, the State must make a prima facie showing of the existence of the conspiracy, without regard to the declarations of the co-conspirator, in order to admit his out-of-court declarations. [Cit.] The trial judge may admit testimony by co-conspirators before the conspiracy has been proved, provided its existence is ultimately shown at trial. *Waldrip v. State*, [266 Ga. at 880 (3)]." *Waldrip v. State*, 267 Ga. at 746 (10) (a). Conduct which discloses a common design, even without proof of an express agreement between the parties, may establish a conspiracy. Id. at 747 (10) (b).

Here, there was sufficient evidence to establish that Livingston was part of the Waldrips' conspiracy to kill Evans and to silence Garner, and thereby prevent the prosecution of John Mark for armed robbery. Livingston's own statements to his cellmate indicate that he was involved with others in an assault against an individual and that he was contemplating the physical evidence implicating him in Evans' murder and potentially subjecting him to the death penalty. The evidence of conspiracy was also supported by the facts that Livingston had close family ties to the Waldrips; he was with them the day and night of the murder; he admittedly was picked up by Tommy Waldrip close in time to the murder; and he conferred several times with the Waldrips by telephone as the authorities were closing in.

---

[3] Livingston cites testimony by Agent Berry, Terri Smith, Larry Little, Randy Helton, and Thomas Hitchcock.

[4] The enumeration of error states that the admission of the statements also violated "the Due Process Clause of the 14th Amendment and the Confrontation Clause of the Sixth"; however, Livingston's argument addresses solely the asserted lack of evidence to support a finding of his involvement in a conspiracy.

Also, a third set of shoeprints was found at the murder scene, and Livingston smoked the same general brand of cigarettes as those found at both the murder scene and the area where the body was found.

4. Livingston also complains of the admission of the testimony by Robert Garner and Thomas Hitchcock about their conversations with John Mark regarding his attempts to prevent Garner from testifying at the retrial of the armed robbery. He again maintains that such testimony could not be admitted under the co-conspirator exception to the hearsay rule because the existence of a conspiracy was not shown at trial. Accepting that the statements at issue were hearsay, there is no merit to the argument that the State failed to make a sufficient showing of the existence of a conspiracy between the Waldrips and Livingston. See Division 3, supra.

5. There is also no merit to Livingston's claim that the trial court erred by allowing hearsay into evidence when it admitted an envelope sent by Thomas Hitchcock to John Mark Waldrip, which was collected during a search of the Waldrips' apartment. The envelope bore the notation "Howard's" along with two apparent telephone numbers. Hitchcock identified the envelope as having contained a letter he sent to John Mark while Hitchcock was in jail, but Hitchcock had no information about the notations on the envelope. But, the envelope and its notations were not hearsay because they were not offered to prove the truth of the matter asserted in the writings. *Childress v. State*, 266 Ga. 425, 436 (4) (467 SE2d 865) (1996). They were offered to show the contact between Hitchcock and John Mark and the connection between the Waldrips and Livingston and that they were able to contact each other by telephone. Thus, the evidence was relevant and, therefore, admissible because it tended to prove material issues in the case. *Brown v. State*, 270 Ga. 601 (2) (512 SE2d 260) (1999). What is more, even if the envelope and its writings were deemed hearsay, they were merely cumulative of other trial evidence of the communication between Hitchcock and John Mark and the contact, including telephone contact, between the Waldrips and Livingston. *Smith v. State*, 266 Ga. 827, 831 (4) (470 SE2d 674) (1996).

6. Livingston likewise fails in the enumeration that the trial court erred by allowing inadmissible hearsay when it permitted the State to read into the record Evans' testimony from John Mark Waldrip's armed robbery trial. The testimony was offered to show the motive for the crimes against Evans and "not to prove that John Mark committed the armed robbery." *Waldrip v. State*, 267 Ga. at 748 (12). The foundation challenge lacks merit as well. Livingston did not specifically complain, as he does now, that the transcript lacked

proper exemplification by the clerk of court.[5] See *Adams v. State*, 264 Ga. 71, 74 (4) (440 SE2d 639) (1994). What is more, the record supports the finding that the trial court considered the transcript as having been certified by both the court reporter and the deputy clerk of court. The certificate or attestation of any public officer can give validity and authenticity to a copy or transcript of a record, document, paper of file, or other matter or thing in or pertaining to the public officer's respective office, sufficient to admit the same into evidence. OCGA § 24-7-20.[6]

7. Finally, Livingston is unsuccessful in his contention that the trial court committed reversible error in refusing to let him cross-examine GBI investigator Stone regarding the involvement of Paul Waldrip, John Mark's brother, in past armed robberies, and thus, precluded him from developing the defense that Paul Waldrip, rather than he, was the third party involved in Evans' murder.

> Certainly a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. [Cit.] However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature. [Cits.]

*Klinect v. State*, 269 Ga. 570, 573 (501 SE2d 810) (1998). Evidence that merely casts a bare suspicion on another or raises a conjectural inference as to the commission of the crime by another is not admissible. *Azizi v. State*, 270 Ga. 709, 714 (6) (512 SE2d 622) (1999). What is more, Livingston was able to present evidence of Paul Waldrip's criminal involvement through other witnesses. Livingston called Paul Waldrip, himself, as a defense witness and Paul testified about his involvement in armed robberies with John Mark. On direct, Robert Garner testified that he had committed an armed robbery with Paul Waldrip. Also, Livingston was able to elicit testimony from Paul Waldrip that Paul smoked Doral cigarettes, and was not precluded,

---

[5] Livingston's objection to the trial court focused on the court reporter's certification and its alleged failure to identify the document.

[6] Although not enumerated as error, Livingston also complains of the admission into evidence of the Forsyth County bench warrant and affidavit for the arrest of John Mark Waldrip, which he identifies as State's Exhibits 113 and 114. See *Rider v. State*, 226 Ga. 14, 15 (2) (172 SE2d 318) (1970). However, the cited portion of the transcript reveals that Livingston's objection was focused on certain notations on State's Exhibit 114, and that ultimately Livingston requested only that if the document was admitted, the notations be redacted.

in any manner, from attempting to imply that Paul Waldrip was the third killer.

*Judgments affirmed. All the Justices concur, except Carley, J., who concurs in Divisions 1, 2, 3, 4, and 6, and in the judgment.*

DECIDED NOVEMBER 22, 1999.

*Harold M. Walker, Jr.*, for appellant.

*Lydia J. Sartain, District Attorney, Lee Darragh, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Angelica M. Woo, Assistant Attorney General*, for appellee.