## S13A1004. WILLIAMS v. THE STATE.
### (749 SE2d 693)

HINES, Presiding Justice.

Tony Williams appeals his convictions and sentences for malice murder, armed robbery, burglary, possession of a firearm during the commission of a felony, tampering with evidence, and possession of a firearm by a first offender probationer, all in connection with the shooting death of Clifford James McArthur. Williams challenges the sufficiency of the evidence, the admission of certain evidence, and the alleged improper impeachment of State's witnesses. For the reasons that follow, we find the challenges to be without merit, and we affirm.[1]

The evidence, viewed in a light most favorable to the verdicts, showed the following. On December 7, 2010, McArthur's body was discovered inside his apartment in Fitzgerald by a man doing pest control; the man entered the apartment by the rear door because the

---

[1] The crimes occurred in December 2010. On January 10, 2011, a Ben Hill County grand jury returned an 11-count indictment against Williams and Christopher Ward as follows: Count 1 – malice murder on December 2, 2010 (Williams and Ward); Count 2 – felony murder on December 2, 2010 while in the commission of aggravated assault (Williams and Ward); Count 3 – aggravated assault on December 2, 2010 (Williams and Ward); Count 4 – armed robbery on December 2, 2010 (Williams and Ward); Count 5 – burglary on December 2, 2010 (Williams and Ward); Count 6 – possession of a firearm during the commission of a felony on December 2, 2010 (Williams and Ward); Count 7 – tampering with evidence on December 9, 2010 (Williams and Ward); Count 8 – obstruction of an officer on December 9, 2010 (Ward); Count 9 – obstruction of an officer on December 9, 2010 (Ward); Count 10 – possession of less than one ounce of marijuana on December 9, 2010 (Ward); and Count 11 – possession of a firearm by a first offender probationer on December 9, 2010 (Williams). In a bifurcated proceeding, Williams pled guilty to Count 11, and he was tried before a jury June 27-29, 2011 on the remaining counts against him; he was found guilty of all such counts. On July 8, 2011, Williams was sentenced to life in prison with the possibility of parole on Count 1; ten years in prison on Count 4, to be served consecutively to the sentence on Count 1; twenty years in prison on Count 5, to be served concurrently with the sentence on Count 1; five years in prison on Count 6, to be served consecutively to the sentence on Count 4; ten years in prison on Count 7, to be served concurrently with the sentence on Count 1; and five years in prison on Count 11, to be served concurrently with the sentence on Count 1. The verdict on Count 2 stood vacated by operation of law, and the verdict on Count 3 merged with that on Count 1 for the purpose of sentencing. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). A motion for a new trial was filed on July 22, 2011, and an amended motion for new trial was filed on December 4, 2012. The motion for new trial, as amended, was denied on January 14, 2013. A notice of appeal was filed on February 8, 2013, and the case was docketed in this Court in the April 2013 term. The appeal was submitted for decision on the briefs.

front door was locked. McArthur's sister, Fuller, and Fuller's daughter, Thomas, traveled to Fitzgerald after learning of McArthur's death. During the visit, Thomas spoke with Christopher Ward, McArthur's nephew, and during the conversation, Ward told Thomas that he had a .22 caliber handgun for sale. Suspicious of Ward, Thomas and Fuller informed the police of the offer. The police provided Fuller with $100 to give to Thomas to purchase the handgun because they suspected Ward was involved in the shooting death of his uncle, McArthur. Thomas then met with Ward and Williams and they took Thomas to a drainage culvert close to the crime scene. While walking to the culvert, Ward mentioned, in the presence of Thomas, that they "didn't want to never do what they did last Thursday again," to which Williams responded, "I know right."

Upon arriving at the mouth of the culvert, Williams "climbed up in the sewer" and retrieved the handgun, which was wrapped in plastic bags. Shortly thereafter, Thomas paid Ward for the handgun, using the money provided by the police.

After further investigation, including interviewing and arresting Ward, the police interviewed Williams several times. During the first interview, during which Williams was not under arrest, Williams stated that on the night of the crimes, he, Ward, and others went to a Christmas parade and then went home; Ward left the home for a period of time and then returned; and when Ward returned home, he was "looking . . . weird, kind of strange acting." The investigator then inquired about the handgun, at which point Williams asked if he could "start over" with his interview. Williams then related that Ward wanted his uncle's handgun; that he was mad at his uncle for giving information about him to police, "getting him locked up"; that Ward was going to "dome" his uncle, which Williams understood to mean that Ward was going to shoot his uncle in the head; that Williams had accompanied Ward to McArthur's apartment on the night of the crimes and was supposed to wait in back of the house for Ward, but instead left the area; after waiting 15 or 20 minutes, Williams walked back to McArthur's apartment, and Ward exited the back door of the apartment; Ward was "acting funny," and when Williams asked him what was wrong, Ward told him that he had "domed" his uncle; Ward pulled out money from his pocket and gave Williams $60 of it; Ward was going to give Williams "half because [Williams] was part of it but [Williams] only took the sixty"; Williams was told to put the handgun "in the ditch"; and Ward had "picked up the shell casing from inside after he had shot [McArthur]."

A few days later when Williams was still not under arrest, he was again interviewed by the investigator, and Williams added some

details to his narrative about the night of McArthur's murder. A redacted audiotape of this interview was played for the jury.

Four days later, following Williams's arrest and his being advised of his *Miranda* rights,[2] police conducted a third interview, which was videotaped and played for the jury. During this interview, Williams admitted he was in the apartment when Ward shot his uncle once in the head; that at some point, Williams took prescription narcotic drugs from McArthur's apartment; after the first shot to McArthur's head, he was still alive and making sounds; and Williams told Ward to shoot McArthur again "to put him out of his misery." The autopsy confirmed that McArthur died as a result of two gunshot wounds to the head. The medical examiner testified that it was possible for an individual wounded like McArthur, either to be alive for a short time after the first shot to the head or to survive the initial wound entirely.

1. Williams raises the general grounds and contends that the trial court erred in denying his motion for directed verdicts of acquittal. The denial of a directed verdict is reviewed under the standard used to evaluate the sufficiency of the evidence to support a criminal conviction, that is, "whether the evidence, viewed in the light most favorable to the verdict[s], would enable a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of the crimes for which he was convicted." *Stratacos v. State*, 293 Ga. 401, 412 (748 SE2d 828) (2013), quoting *Spiller v. State*, 282 Ga. 351, 355 (5) (647 SE2d 64) (2007). The evidence of Williams's guilt was constitutionally sufficient. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Williams contends that the trial court erred by overruling his hearsay objection to the admission into evidence of testimony by Thomas about an exchange between Ward and Williams, namely Ward's statement that "he didn't want to never do what they did last Thursday again," and Williams's response, "I know right." Williams relies upon former OCGA § 24-3-5,[3] in effect at the time of his trial, and *Livingston v. State*, 271 Ga. 714 (524 SE2d 222) (1999), to argue that the trial court should have required the State to show a prima facie case of conspiracy before admitting such evidence, and inasmuch as it did not, the statements were inadmissible hearsay which

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[3] Former OCGA § 24-3-5 provided:
> After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all.

caused him irreparable prejudice and denied him a fair trial.[4]

For hearsay statements to be admissible under the co-conspirator exception in former OCGA § 24-3-5, the State need not make out a prima facie case of conspiracy *prior* to introduction of the statements; the statements are admissible when the State establishes a prima facie case of conspiracy independent of the co-conspirator's statement at any time before the close of evidence. *Thorpe v. State*, 285 Ga. 604, 610 (5) (678 SE2d 913) (2009). Furthermore, a conspiracy may be shown by direct proof, or by inference, deduced from acts and conduct, which discloses a common design to act in concert for the accomplishment of the unlawful purpose; the common design or purpose may be shown by direct or circumstantial evidence. *Darville v. State*, 289 Ga. 698, 699 (2) (715 SE2d 110) (2011). And, so it was in this case.

As has been outlined in the statement of facts, independent of the statements at issue, there was ample evidence of a common design or criminal purpose between Ward and Williams, including the concealment and attempted sale of the murder weapon and Williams's inculpatory statements to police. The statements at issue were admissible against Williams under former OCGA § 24-3-5.

3. Lastly, Williams contends that the trial court erred when it allowed the State to improperly impeach the testimony of two of its witnesses by eliciting testimony from an investigator in the case about certain prior inconsistent statements made to police by the witnesses. He argues that the proper method to impeach the witnesses would have been to question them on the stand to give them the opportunity to explain the inconsistencies. However, Williams's complaints are unavailing. The record reveals that Williams's objection at trial to the testimony at issue was on hearsay grounds; he did not complain on the ground that it was an impermissible method of impeachment of the State's witnesses.[5] Therefore, he cannot now complain of it. *Dyer v. State*, 287 Ga. 137, 143 (8) (695 SE2d 15) (2010).

*Judgments affirmed. All the Justices concur.*

---

[4] In argument, Williams further complains that the trial court failed to evaluate the reliability of the statements; however, such complaint is not preserved for appeal because at trial Williams did not object to the statements on the basis that they were unreliable. *Dyer v. State*, 287 Ga. 137, 143 (8) (695 SE2d 15) (2010).

[5] The only contemporaneous comments by the defense regarding impeachment were not objections on the basis now urged. As to the investigator's sought testimony about one of the witnesses, defense counsel merely commented, "Is it my understanding he's impeaching his own witness?" In regard to the sought testimony about the other State's witness, defense counsel stated, in pertinent part, "I mean of course this is hearsay . . . is this another impeachment of his own witness? Is this — I'm objecting. It's hearsay."

DECIDED OCTOBER 7, 2013.

*David E. Morgan*, for appellant.

*Denise D. Fachini, District Attorney, Bradford L. Rigby, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General,* for appellee.