301 Ga. 689
FINAL COPY

S17A0708. WILSON v. THE STATE.

MELTON, Presiding Justice.

Following a jury trial, Dontavious Wilson appeals his convictions for the murder of Jack Camp, possession of marijuana with the intent to distribute, and related crimes, contending that the evidence was insufficient to support the verdict and the trial court erred by failing to properly instruct the jury.[1] For the

---

[1] Along with Darrell Anderson and Christopher Ingram, Wilson was indicted on April 28, 2010 for conspiracy to commit murder, malice murder, two counts of felony murder, aggravated assault, possession of a firearm during the commission of a felony, possession of a firearm by a first offender probationer, and possession of marijuana with intent to distribute. Following a joint jury trial, Wilson was found guilty on all counts except possession of a firearm by a first offender, which was ultimately dismissed. On January 12, 2011, the trial court sentenced Wilson to life imprisonment for malice murder, five consecutive years for possession of a firearm during the commission of a felony, and ten years for possession of marijuana to be served consecutively to the firearm charge. The convictions for felony murder were vacated by operation of law, Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993), and the remaining charges were merged for purposes of sentencing. Wilson filed a motion for new trial on January 12, 2011, and amended it on May 30, 2014. The trial court denied the motion on July 23, 2015, but it later vacated that order and entered a new order on October 8, 2015. Wilson filed a timely notice of appeal, and his case was thereafter docketed to the April 2017 term of this Court and submitted for decision on the briefs.

reasons set forth below, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence shows that Camp was fatally shot while working as a security guard at the Regency Club Apartments in Albany, Georgia around 1:00 a.m. on March 14, 2007. Moments before the shooting, Camp phoned 911 to ask for assistance. The 911 operator overheard a male voice in the background say, "Oh hell, he's calling the police." Shortly thereafter, law enforcement arrived, and a resident who had been walking through the complex at the time that Camp was shot implicated Wilson, Darrell Anderson, who is Wilson's cousin, Christopher Ingram, Luke Sears, and Kentrell Barney. Another resident stated that she witnessed Wilson and Camp arguing just before the shooting occurred. Investigators interviewed all of the men who had been identified as being on the scene, but they initially denied any knowledge about Camp's murder. After being arrested for giving a false statement, however, Sears decided to tell law enforcement what he knew about the shooting.

Sears, who testified at trial, stated that he went to drink and smoke marijuana with Anderson, Wilson, Ingram, and Barney at the home of Wilson's girlfriend, Pauline Davis, at around 7:00 p.m. on March 13, 2007. There, Sears

2

witnessed Ingram pull out a revolver, and the other men "horsed around" with it. Eventually, the five men went to the Regency Club Apartments in two cars because Wilson, Anderson, and Ingram wanted to sell crack. Sears rode with Barney and Wilson, while Ingram rode with Anderson. Sears fell asleep in Wilson's car while the other men walked into the apartment complex. Sears was awakened by gunshots, and, moments later, Wilson returned to the car with a revolver that looked like the one that belonged to Ingram. Sears jumped out of Wilson's car, saw Camp's body, and began running. A short time later, however, he got back into Wilson's car, and Wilson instructed him, "[y]ou ain't seen nothing," and "[y]ou don't know nothing." Wilson then drove back to Davis's home, and Wilson gave what Sears thought to be the revolver wrapped in a towel to Ingram. Anderson then said, "I told the n****** the man was going to call the police, and we just went to [shooting]."[2]

---

[2] We note that, to the extent that Sears could be considered an accomplice of Wilson, Sears's testimony was amply corroborated by multiple sources. See former OCGA § 24-4-8 (in "felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient [to establish a fact]. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason"). We previously considered similar arguments in the appeal of Anderson, Wilson's co-defendant. See Anderson v. State, 299 Ga. 193 (787

Two jailhouse informants also provided testimony concerning Camp's murder. One informant, who spoke with Anderson in jail, said that Anderson told him that Wilson had gotten into a "confrontation" with Camp at the Regency Club Apartments. Another informant, who spoke with both Anderson and Wilson, testified that Anderson told him that he and Wilson were going to "beat" the charges "because they ain't got nothing on us" and that Sears "is the only one telling." According to the informant, when Anderson said this, Wilson "hit his leg, like to shut up," and the conversation ended. The same informant later spoke only to Wilson, who explained that Sears was "telling everything" and that he was "going to try to get some of [his] people to go talk to [Sears] and see if he will change his statement." Wilson then admitted that he, Anderson, and Sears had been "drinking, popping pills, and smoking weed" when they decided to make a drug sale at the apartments by Dougherty High School. But "when they got there, something went wrong with the drug sale" and Wilson admitted that he shot Camp.

Anthony Johnson, who is Davis's brother, testified that Davis called him

SE2d 202) (2016).

4

at a point after Camp's murder. Johnson was in jail at the time, but Wilson was not. In the middle of the conversation, Davis had to deal with a visitor, and she handed the phone to Wilson. Johnson and Wilson chatted, and Johnson asked Wilson about Camp's murder. During this conversation, Wilson stated to Johnson, "I shot him." In addition, Tabitha Woodall testified that Ingram called her in the early morning hours following the shooting and told her that Camp had been killed. In a later conversation, Ingram told Woodall that Wilson was the person who shot Camp.

At the time that Wilson was questioned in his home regarding Camp's murder, he admitted to police that he had cash and marijuana in his pockets. He was carrying $700 in cash, and he possessed 1.7 grams of a substance later proven to be marijuana. A subsequent probationary search of Wilson's home turned up additional marijuana. Testimony further indicated that the marijuana possessed by Wilson was in individual-sized baggies.

This evidence was sufficient to authorize the jury to find Wilson guilty of the crimes of which he was convicted beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. (a) Nonetheless, Wilson contends that hearsay statements of his co-

5

conspirators were improperly admitted against him. Specifically, Wilson contends that the State failed to make a prima facie showing of conspiracy. We disagree with this contention.

Former OCGA § 24-3-5, applicable to this case,[3] states: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." To trigger this exception to the hearsay rule

> the State must make a prima facie showing of the existence of the conspiracy, without regard to the declarations of the co-conspirator, in order to admit his out-of-court declarations. The trial judge may admit testimony by co-conspirators before the conspiracy has been proved, provided its existence is ultimately shown at trial. Conduct which discloses a common design, even without proof of an express agreement between the parties, may establish a conspiracy.

(Citations and punctuation omitted.) Livingston v. State, 271 Ga. 714, 719 (3) (524 SE2d 222) (1999).

A prima facie showing of conspiracy was made in this case. Sears, who was present at trial, testified extensively regarding the night of the murder,

---

[3] Wilson's trial occurred prior to January 1, 2013, the effective date of the new Georgia Evidence Code. The admission of co-conspirator statements is now governed by OCGA § 24-8-801(d) (2) (E).

covering the activities of the group, including Anderson specifically, both before and after the murder itself. In addition, Wilson, himself, made admissions that he had gone to Regency Club Apartments to sell drugs, that Camp interfered, and that he shot Camp as a result. Further evidence indicates that Wilson used Ingram's gun to shoot Camp and that the defendants arrived at the scene together, left the scene together, and actively began concealing the crime together afterward. The statements of co-conspirators were properly admitted. There was no error.

(b) Wilson also maintains that he should not have been convicted of possession of marijuana with intent to distribute because the arresting officer did not testify that the amount of marijuana possessed by Wilson was inconsistent with personal use. The existence of the intent to distribute marijuana, as opposed to the intent to merely possess it, "is peculiarly a question of fact for jury determination." Hughes v. State, 297 Ga. App. 217, 218 (676 SE2d 852) (2009). The evidence showed that Wilson possessed a large amount of cash and at least 1.7 grams of marijuana. In addition, the marijuana was contained in small packets, and the testifying police officer opined that this evidence was consistent with distribution, not mere possession. This evidence supported the jury's

7

determination that Wilson was guilty of possession of marijuana with the intent to distribute beyond a reasonable doubt. Id.

3. Wilson contends that the trial court committed plain error by failing to properly instruct the jury regarding co-conspirator statements. Specifically, Wilson, relying on Mangum v. State, 274 Ga. 573, 578 (3) (e) (555 SE2d 451) (2001), contends that the trial court erred by failing to instruct the jurors that they were required to find the existence of a conspiracy beyond a reasonable doubt prior to considering the out-of-court statements of co-conspirators.

Because Wilson made no objection to the trial court's instructions, he must show plain error. In order to satisfy the test for plain error,

> [f]irst, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

(Citations, punctuation and emphasis omitted.) State v. Kelly, 290 Ga. 29, 33 (2)

(a) (718 SE2d 232) (2011). "In the case of a review for 'plain error,' it is not sufficient to find actual legal error, 'as the jury instruction in question must have an obvious defect rather than a merely arguable defect.'" Hoffler v. State, 292 Ga. 537, 542 (4) (739 SE2d 362) (2013), citing Terry v. State, 291 Ga. 508, 509 (2) (731 SE2d 669) (2012).

Assuming without deciding that Wilson could satisfy the first two prongs of the plain error test, he cannot satisfy the third. As an initial matter, the record reveals that there was sufficient evidence of a conspiracy without considering the out-of-court statements of co-conspirators in order for the State to make a prima facie showing that the conspiracy existed. "The law is clear that an express agreement is not needed to establish a conspiracy." (Citation omitted.) Turner v. State, 275 Ga. 343, 345 (2) (566 SE2d 676) (2002). "[P]resence, companionship and conduct [that discloses a common design] before and after the offense are circumstances which may give rise to the existence of a conspiracy." (Citations omitted.) Id. Sears was called as a witness at trial, and his lengthy in-court testimony showed the existence of a conspiracy. In addition, the record shows that, when Camp called for assistance, he told the operator that he was with multiple subjects, and the record shows that Anderson and Ingram

9

got out of their cars and went with Wilson to sell crack cocaine. When the victim called 911, someone in the group said, "Oh hell, he's calling the police," and the evidence showed Anderson made a similar statement while at the complex. Testimony also indicated that Wilson killed the victim with Ingram's gun, and further evidence at trial showed that Wilson, Anderson, and Ingram were actively working together to prevent or defeat prosecution after the victim's murder. Moreover, as detailed above, the evidence includes an admission by Wilson to a cellmate that he intended to sell drugs at Regency Club Apartments and two separate admissions, one to a cellmate and one to Johnson, that he shot Camp. In light of these direct admissions of guilt, even if we assume without deciding that the trial court's instructions were inadequate, Wilson has failed "to make an affirmative showing that the [admission of statements by co-conspirators] probably did affect the outcome below." (Citation and punctuation omitted.) Gates v. State, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016).

Judgment affirmed. All the Justices concur.

Decided August 14, 2017.

Murder. Dougherty Superior Court. Before Judge Gray, Senior Judge.

Mark A. Yurachek, for appellant.

Gregory W. Edwards, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.