304 Ga. 547
FINAL COPY


S18A1169. DAVIS v. THE STATE.


Boggs, Justice.

In May 2009, a jury found Billy Randy Davis, Joseph Andrews, and Tremaine "Dick" Calhoun guilty of malice murder and felony murder in the shooting death of Cornelius Lowe.[1] Davis was sentenced to life imprisonment. His second amended motion for new trial was denied, and he appeals, asserting error in the admission of a co-defendant's statement, denial of his motion to sever, and merging rather than vacating his felony murder conviction. For the reasons stated below, we affirm.

---

[1] The crimes occurred on February 5, 2004. On September 18, 2007, a Putnam County grand jury indicted the three defendants for malice murder and felony murder. They were tried together before a jury on May 12-20, 2009. The jury found Davis guilty on both counts. The trial court merged the felony murder count into the malice murder count and sentenced Davis to life imprisonment. Davis filed his initial motion for new trial on May 26, 2009. New counsel amended the motion on June 29, 2015. The trial court initially denied the amended motion on December 7, 2016, but upon the filing of a second amended motion for new trial on December 16, 2016, that order was vacated and a new order entered on April 2, 2018. Davis' notice of appeal was filed on April 5, 2018. The case was docketed in this Court for the August 2018 term and submitted for decision on the briefs. We note that this is yet another case with an inordinate delay in resolving a motion for new trial. See Owens v. State, 303 Ga. 254, 258-260 (4) (811 SE2d 420) (2018).

Construed to support the verdict, the evidence showed that two young girls walking home from school discovered the victim's body on a footpath in the city of Eatonton in the late morning of February 5, 2004. The victim was lying on his back with his right front pants pocket turned out. He had sustained four gunshot wounds to the head, at least one of which left powder deposits on his clothing. Forensic evidence showed that he was on his knees when he was shot.

The victim, who was known to sell marijuana, was last seen shortly after midnight, in the early morning of February 5. The friends who were with him at that time testified that his cell phone rang between 15 and 20 times, and telephone records confirmed that testimony. The last number to call the victim's phone was assigned to Wykeshia Andrews, and co-defendant Andrews asked to use her phone shortly before the time of the murder. Wykeshia Andrews testified that it was "probably" true that Andrews used her phone. She also testified that the victim carried small red baggies of marijuana for delivery. Police discovered several similar red baggies near the victim's body. Later on February 5, a witness observed a shoe box top containing small red bags of marijuana in the possession of Andrews and Calhoun.

2

Several local residents recalled hearing shots fired around 1:00 a.m. on February 5. An eyewitness, Hargrove, testified that she was walking down the street and saw three men chasing someone down the footpath and then heard "a lot of shots." Frightened, she ran to a nearby trailer, where a group of men were playing cards, and asked an acquaintance, Wesley, if he had heard the gunshots. When the group appeared uninterested, she continued on her way. A short time later, Hargrove saw two men running back out of the footpath, and the taller of the two ducked behind a nearby vacant house. Hargrove met with a sketch artist and described the two men she had seen running past her. The resulting sketches were displayed to the jury. Hargrove reluctantly acknowledged that the two men she saw could have been Davis and Calhoun.

Wesley testified that Hargrove came to the door of the trailer at about 1:00 a.m. and recounted the incident. He said that Hargrove told him that the two men she saw running away were Calhoun and "the other one looked like Billy Randy Davis." Wesley further testified that Calhoun and Davis had threatened him and that Calhoun had offered him money not to testify. A police officer testified that he saw Andrews, Calhoun, and Davis together the afternoon before the murder. Another eyewitness, Evans, gave a recorded statement to police in which he

identified Andrews and Calhoun as the men he saw running in the area at the time of the murder. He marked for police on a sketch plan where he saw the men running into the footpath, and then back out after he heard gunshots.[2]

Footprint casts taken from the area around the body were similar to shoes worn by Andrews and Calhoun. When police searched a shed behind the vacant house described by Hargrove as the place to which the taller man ran, they discovered a "very old" .22 caliber revolver, dating to the 1940s or 1950s, hidden up between the rafters. Ballistic testing revealed that the Winchester brand .22 caliber bullets removed from the victim's body had "definite marks" consistent with bullets test fired from the recovered revolver, although the bullets were so damaged by impact that the firearms expert could not "say with one hundred percent certainty" that they were fired from that revolver. A partial box of Winchester brand .22 ammunition was discovered in Andrews' bedroom. "Touch DNA" testing was performed on the handle of the revolver and excluded

_____

[2] Evans repeatedly disavowed his statement on the witness stand, claiming that he did not remember or that he had lied. He added that "they said the guy was dangerous, and I didn't want — you know, I didn't know nothing, I didn't want to say nothing because I didn't know — they hadn't never caught him. . . ." His recorded statement was played for the jury. A police officer testified that Evans was fearful of what might happen if it became known that he was talking to law enforcement.

Andrews and Calhoun. However, the recovered DNA matched Davis' DNA in 14 out of 16 locations, and the DNA expert concluded that Davis could "very possibly" have contributed that DNA to the gun handle.

Another witness, Sanders, testified that he gave Davis a ride in the early evening of February 5, and Davis asked him "how to cover up a murder." Sanders testified that Davis told him "he had been involved in a murder, but he didn't kill nobody" and that two people were with him, though he did not name them. Sanders told Davis, "I don't want to know nothing about it." Andrews' half-brother testified that he had a discussion with Andrews, Calhoun, and Davis after he found Andrews in tears and asked what was wrong. Andrews and Davis said they intended only to rob the victim, but a confrontation occurred, they began chasing him, and he fell or was shot and fell. He was begging for his life when Calhoun shot him again. Another witness, Jackson, confronted Calhoun about the murder, saying, "Y'all didn't have to do him like that." Calhoun responded that he "did what he had to do" and "what I give a f--- about killing a n------." A neighbor, Smith, heard Calhoun admit that he had killed someone for Andrews. After she told Andrews' mother about the statement, Calhoun and Andrews confronted her and told her she "will be next in line." Two other

5

witnesses overheard Andrews tell Calhoun that he was not going to talk or take a murder charge if Calhoun did not.

A jailhouse witness, Arnold, testified that Andrews told him that he, Calhoun, and another person intended to rob the victim with "an old revolver" but that Calhoun shot him, went through his pants pocket, and threw away the gun. Another jailhouse witness, Lankford, testified that Calhoun told him they robbed drug dealers with "an old .22 revolver, western style" and shot the victim in the face and head.[3] And a third jailhouse witness, Swain, testified that Andrews told him that he, Calhoun, and Davis met the victim by chance on their way to rob Wesley. They pulled a gun on the victim to rob him, but he ran away, and Calhoun shot him because he could identify them. Davis' former girlfriend and the mother of two of his children testified that Davis told her that "they robbed [the victim] and he tried to run and they shot him." She testified that Davis had threatened her, saying that he "would blow my brains out like he did Lowe." Davis was angry because Andrews "got drunk and told his girlfriend what they had done."

---

[3] Arnold noted that he did not want to talk to the police about what Andrews told him because Lankford was attacked in the jail for "snitching."

Wesley further testified that he heard Davis say that he wanted to let the victim's mother, who was mortally ill, know before she died that Andrews, Calhoun, and Davis had robbed the victim and Calhoun had killed him. Wesley also testified about another occasion on which Calhoun robbed him, and that Davis told him, "What happened to Cornelius Lowe was meant for you." Another witness, Monday, testified that, about one week before the murder, Andrews and Calhoun robbed him of the drugs he was selling and shot a gun into the air. During his testimony at trial, Andrews acknowledged that he and Calhoun took drugs from Monday, but he testified it was "not a robbery" because it was "just dope," and the police were not called.[4]

1. Although Davis has not raised the sufficiency of the evidence in his appeal, we note that the evidence was more than ample to support the jury's guilty verdicts under Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Indeed, with multiple witnesses and identifications, incriminating

---

[4] Andrews was the only co-defendant who testified at trial. He asserted that he was with Calhoun until between 11:00 and 11:30 p.m., and then went to his girlfriend's house, where he spent the night. He denied any involvement in the murder, and he denied admitting to any witness that he had been involved. Andrews' conviction was affirmed in Andrews v. State, 293 Ga. 701 (749 SE2d 734) (2013). He also asserted error in the admission of statements by his co-defendants, but that claim was waived by his failure to make a contemporaneous objection. Id. at 704 (3).

statements, and threats to witnesses, the evidence was overwhelming.

2. In his first enumeration of error, Davis contends the trial judge erred in admitting the testimony of Joseph Andrews' cellmate, Swain, regarding statements made to him by Andrews, because the State failed to show the existence of a conspiracy.[5] Davis filed a pretrial motion to determine the admissibility of this evidence. The trial court reserved ruling on the motion but denied it after the State rested, stating, "I find the State has established a prima facie case of conspiracy and will let that question go to the jury."

Under former OCGA § 24-3-5,[6] the rule was that "the State must make a prima facie showing of the existence of the conspiracy, without regard to the declarations of the co-conspirator, in order to admit his out-of-court declarations." (Citations and punctuation omitted.) Livingston v. State, 271 Ga. 714, 719 (3) (524 SE2d 222) (1999). So long as the existence of a conspiracy

---

[5] As the State notes, Swain's testimony regarding Andrews' statement to him in the jail appears to be the only co-conspirator's statement specifically complained of by Davis on appeal. Other statements by Andrews and Calhoun, including Andrews' statement in Davis' presence, are not raised in this enumeration.

[6] The trial took place in 2009, before the 2013 effective date of the new Evidence Code. The former Code section provided: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."

ultimately is proved at trial, the trial court may admit the testimony of co-conspirators before evidence of the conspiracy is introduced. Id. And the State's showing of a common design may be sufficient without proof of an express agreement among the parties. Id.

OCGA § 16-4-8 provides: "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy. . . ." Here, the State presented ample evidence that Davis was part of a conspiracy with Andrews and Calhoun, including testimony that he was seen with them the afternoon before the murder, all three men were seen running near the scene by eyewitnesses, and DNA recovered from the murder weapon matched Davis' DNA in 14 of 16 locations. Moreover, Davis told a witness that he and two people were involved in a murder and asked "how to cover [it] up," described the circumstances of Lowe's murder in detail to others, and threatened witnesses that they could meet or might have met a fate similar to Lowe's.

At the time of trial, the law provided that the pendency of a conspiracy was indefinite and included not only the crime but also the phase during which

the crime or the identities of the perpetrators were concealed. See Waldrip v.

State, 266 Ga. 874, 880 (3) (471 SE2d 857) (1996). And the co-conspirator

exception to the hearsay rule

> applied to statements made by co-conspirators not only leading up
> to and during the underlying crime but also afterward, during the
> concealment phase of the conspiracy. Moreover, in cases decided
> under the former Code section, admissible statements included not
> only those in which a co-conspirator attempted to pursue or conceal
> the conspiracy, but also statements which simply recounted the
> conspirators' participation in the original crime.

(Citations and punctuation omitted.) State v. Wilkins, 302 Ga. 156, 158 (805

SE2d 868) (2017).[7] To the extent that Davis argues that the witnesses to the

conspiracy were unworthy of belief, this goes to the weight, not the

admissibility, of their testimony. The State clearly proved the existence of a

conspiracy, and this enumeration of error is without merit.

3. Davis next contends that the trial court erred in denying his motion to

sever, claiming that the number of defendants created confusion for the jury and

possibly caused evidence against Andrews and Calhoun to be applied to him,

despite the trial court's instruction to the contrary.

---

[7] Wilkins notes the substantially different provisions of the new Evidence Code regarding statements by co-conspirators. 302 Ga. at 158-159.

Assuming without deciding that Davis successfully preserved this enumeration of error,[8] it is without merit.

> It is well-settled that a trial court has broad discretion to grant or deny a motion for severance. In ruling on a severance motion, the trial court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process.

(Citations and punctuation omitted.) <u>Kitchens v. State</u>, 296 Ga. 384, 386 (3) (768 SE2d 476) (2015). Davis has failed to show that the trial court abused its discretion with respect to this test. All three defendants were indicted for the same offenses, and the jury was instructed as to the applicable law, including parties to a crime and conspiracy. We cannot say that Davis has demonstrated that the jury improperly considered evidence against the other defendants in deciding his case. As noted above, the evidence directly implicating Davis, including eyewitness testimony as well as his statements and threats to others regarding his participation, was substantial. Moreover, the trial court twice gave

---

[8] Davis did not expressly join in Calhoun's written motion to sever, which does not appear in the record.

a limiting instruction, at Davis' request, that certain evidence admitted with respect to the other defendants "did not relate to the Defendant Billy Randy Davis, Jr." We cannot say that the trial court abused its discretion in denying the motion to sever.

4. Finally, the State concedes that when a defendant is found guilty of both malice murder and felony murder, the alternative felony murder count is not merged but "stands *vacated* by operation of law as simply surplusage." (Citations omitted; emphasis in original.) Hulett v. State, 296 Ga. 49, 53 (2) (766 SE2d 1) (2014). However, the judgment against Davis was correct, as no conviction or sentence was imposed for felony murder.

Judgment affirmed. All the Justices concur.

Decided October 9, 2018.

Murder. Putnam Superior Court. Before Judge Prior.

Kevin A. Anderson, for appellant.

Stephen A. Bradley, District Attorney, Allison T. Mauldin, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Meyerhoefer, Assistant Attorney General, for appellee.